IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

PROVENA HOSPITALS,                              *
   successor-in-interest to
MERCY CENTER FOR HEALTH                         *
CARE SERVICES,
19065 Hickory Creek Drive                       *
Mokena, Illinois 60448
                                                *

        Plaintiff,                       CIVIL CASE NO.
                                                *
       v.
                                                *
MICHAEL O. LEAVITT, as Secretary of
Health and Human Services,                      *
200 Independence Avenue, S.W.
Room 615F                                       *
Washington, D.C. 20202
                                                *
Serve:
                                                *
1.   Jeffrey A. Taylor,
     The United States Attorney
       for the District of Columbia      *
     555 4th Street, N.W.
     Washington, D.C. 20530            *

2.   Michael B. Mukasey,
     The Attorney General of the United States  *
     U.S. Department of Justice
     950 Pennsylvania Avenue, N.W.     *
     Washington, D. C. 20530-0001
                                                *
3.   Michael O. Leavitt,
     The Secretary of Health and Human
       Services,                       *
     c/o Office of the General Counsel
     Hubert H. Humphrey Building       *
     Room 722A
     200 Independence Avenue, S.W.     *
     Washington, D.C. 20201
                                                *

      Defendant.
                                    *       *       *

COMPLAINT FOR JUDICIAL REVIEW OF FINAL
ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

Plaintiff, Provena Hospitals, successor-in-interest to Mercy Center For Health Care Services, by its undersigned attorneys, hereby files this Complaint.  This action involves the failure of Defendant, Michael O. Leavitt, Secretary of Health and Human Services, to reimburse the Plaintiff amounts to which it is entitled under the Medicare program, namely reimbursement for its loss incurred on consolidation with an unrelated entity.

PARTIES

1.    During the relevant time period, Mercy Center for Health Care Services ("Mercy Center") was a non-profit hospital located in Aurora, Illinois.  Mercy Center was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u).  Provena Hospitals is a non-profit corporation located in Mokena, Illinois, which is the successor-in-interest to Mercy Center, as further described in paragraphs 22 and 23 of the Complaint.

2.    Defendant Michael O. Leavitt, Secretary of Health and Human Services (hereinafter, "Secretary" and "HHS"), is responsible for the administration of the Medicare Program under Title XVIII of the Social Security Act, as amended.  42 U.S.C. §§ 1395-1395ggg (hereinafter, the "Act").  Pursuant to Medicare regulations, the Secretary is the real party in interest in the administration of the Medicare Program.  42 C.F.R. § 421.5(b).  The Centers for Medicare and Medicaid Services (hereinafter, "CMS") is the operating component of HHS charged with the administration of the Medicare Program.  During the cost reporting period at issue, CMS was known as the Health Care Financing Administration (hereinafter, "HCFA")

<u>JURISDICTION AND VENUE</u>

3.      This action arises under the Medicare statute (Title XVIII of the Act, 42 U.S.C. § 1395-1395ggg); the Administrative Procedure Act, 5 U.S.C. §§ 553-808 (hereinafter, the "APA"); and the Declaratory Judgment Act, 28 U.S.C. § 2201.  The action is based upon the failure of the Secretary to reimburse Mercy Center for certain costs related to its provision of health care services to Medicare beneficiaries, namely, compensation for the loss it incurred from its consolidation with four unrelated entities.

4.      This Court has jurisdiction under 42 U.S.C. § 1395oo(f)(1).

5.      Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391.

<u>MEDICARE STATUTORY AND REGULATORY FRAMEWORK</u>

6.      Title XVIII of the Act establishes a program of health insurance for the aged and disabled commonly known as "Medicare."  42 U.S.C. §§ 1395-1395 *et seq.* The Medicare program is divided into four parts, Part A through Part D.  Part A and Part B of the Medicare program are the only parts that are relevant to this proceeding.  Part A (the hospital insurance program) provides for reimbursement of inpatient hospital services.  42 U.S.C. §§ 1395c-1395i-5.  Part B (the supplemental medical insurance program) pays for various health services not covered by Part A, including physician services and hospital outpatient services. 42 U.S.C. §§ 1395j-1395w-4j.

7.      To participate in the Medicare program, a hospital must file a "provider agreement" with the Secretary.  42 U.S.C. § 1395cc.

8.      Payment to providers of Medicare services is made through fiscal intermediaries pursuant to contracts with the Secretary.  42 U.S.C. § 1395h.

9.     The fiscal intermediary for Mercy Center during the period at issue in this case was AdminaStar Federal, Inc, acting as subcontractor for BlueCross and BlueShield of Association (hereinafter, collectively "Intermediary").     As a result, Intermediary was responsible for Medicare audit of, and payment to, Mercy Center.

10.     Historically, the Medicare program reimbursed hospital services on a "reasonable cost basis." 42 U.S.C. § 1395f(b).  Section 1861 of the Act requires that the reasonable cost of services reimbursed under the Medicare program be determined in accordance with regulations promulgated by the Secretary.  42 U.S.C. § 1395x(v)(1)(A). During the relevant time period, Section 1861 of the Act also required the Secretary to provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984.  42 U.S.C. § 1395x(v)(1)(O).

11.     Since its inception, Medicare regulations have recognized that depreciation represents a reasonable cost of services required to be reimbursed under the Medicare statute. *See* 42 C.F.R. § 413.134.  Recognition of depreciation compensates a provider for an asset's loss of value resulting from its use in furnishing services to Medicare beneficiaries.  Medicare reimburses depreciation costs to a provider on an annual basis, based on the historical cost of each depreciable asset divided by its estimated useful life.  Generally, if upon disposal of a depreciable asset, a Medicare provider receives more than the asset's historic cost less previously recognized depreciation allowances ("Medicare book value"), then a gain occurs. In that event, Medicare recognizes the gain in the determination of the provider's allowable cost and recoups previously paid reimbursement for depreciation.  Generally, if upon disposal of a depreciable asset, a provider receives less than the asset's Medicare book value, then Medicare recognizes the loss in the determination of the provider's allowable cost and pays

additional reimbursement to compensate the provider for the previously unrecognized depreciation.

12.    Medicare depreciation regulations require that, upon the consolidation of two or more corporations that are unrelated, assets of the provider corporations be "revalued." 42 C.F.R. § 413.134(l). Medicare policies also require that a consolidating provider recognize any gain or loss incurred on the transaction, determined based on a comparison of the consideration received for its depreciable assets and their "Medicare book values." Medicare Intermediary Manual § 4502.7.

13.    The Social Security Amendments of 1983, Pub. L. 98-21, 97 Stat. 65 (1983), created a new method for payment of hospital inpatient services based upon a prospective payment system. Effective for cost reporting periods beginning on or after October 1, 1983, Medicare began paying hospitals for certain inpatient operating costs based on a beneficiary's diagnosis at the time of discharge. The amount per discharge varies according to the diagnosis-related group into which the patient's treatment falls. 42 U.S.C. § 1395ww(d).

14.    The Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4006(b), 101 Stat. 1330, 1330-52 (1987) required payments for certain capital-related costs of hospitals to be made in accordance with a capital prospective payment system established by the Secretary, effective for cost reporting periods beginning on or after October 1, 1996. Medicare regulations implementing the statutory directive are at 42 C.F.R. § 412.300, *et. seq.*

15.    The statutory and regulatory amendments providing for use of a prospective payment methodology to pay for hospital inpatient operating costs and capital-related costs did not, however, result in a change to Medicare regulations addressing consolidations between unrelated parties.

16.    Medicare providers are required to file annual cost reports with their fiscal intermediaries.   Within twelve (12) months following the receipt of a cost report, the intermediary is required to send the provider a notice of amount of program reimbursement (hereinafter, "NPR") setting forth the amount of payment due to the provider by Medicare.  42 C.F.R. §§405.1803(a), 405.1835(c).   The NPR is considered the intermediary's final determination of total Medicare reimbursement due to the provider for the Medicare cost year to which the NPR relates.

17.    A provider that is dissatisfied with the determination reflected in its NPR may, provided that the amount in controversy exceeds $10,000, request a hearing before the Provider Reimbursement Review Board (hereinafter, "PRRB"), by filing an appeal within one hundred eighty (180) calendar days from the date of receipt of its NPR.   42 U.S.C. §1395oo(a); 42 C.F.R. §§ 405.1801-405.1889.   The PRRB has the authority to affirm, reverse, modify or revise an intermediary's determination reflected in the NPR.   A PRRB decision becomes final sixty (60) days after the receipt of the PRRB's decision unless, within that time, the provider requests judicial review or the CMS Administrator reverses, affirms or modifies the PRRB decision.  42 U.S.C. § 1395oo(f)(1).

18.    A provider may obtain judicial review of a final decision of the PRRB, or of the reversal, affirmation, or modification by the CMS Administrator of a PRRB decision, by filing a civil action within sixty (60) days of the date on which the provider receives notice of (1) a final decision by the PRRB or (2) any reversal, affirmation, or modification by the CMS Administrator.  *Id*.  A provider that seeks judicial review and is the prevailing party in such litigation is entitled to interest on the amount in controversy from the first day of the first

month beginning after the end of the one hundred eighty (180) day appeal period referenced above.  42 U.S.C. § 1395oo(f)(2).

<div align="center">FACTS OF THE DISPUTE</div>

19.    Prior to the consolidation described below, Mercy Center was a Catholic-sponsored, not-for-profit corporation which provided acute inpatient and outpatient hospital services.  Mercy Center's sole corporate member was Mercy Health Corporation ("Mercy Health").  Mercy Health was sponsored by The Sisters of Mercy of the Americas, Regional Community of Chicago ("Sisters of Mercy").

20.    From the Medicare program's inception until the consolidation described below, Mercy Center received Medicare depreciation allowances based on its assets' historic cost and Medicare useful life guidelines.

21.    Prior to the consolidation described below, Mercy Center recognized that it could no longer survive as an independent hospital.  Mercy Center's facilities were out-of-date and generally inadequate for it to compete in the marketplace, it was operating at only 50% - 55% of its capacity, and it was at risk of losing its primary referral source, which had been purchased by a large hospital system.

22.    Effective October 1, 1995, Mercy Center consolidated with Franciscan Sisters Health Care Corporation ("Franciscan Health Care"), St. Mary's Hospital of Kankakee, Illinois ("St. Mary's Hospital"), Covenant Medical Center of Champaign, Urbana ("Covenant Medical Center") and ServantCor.  Mercy Center was not subject to common ownership or common control with any of these entities prior to consummation of the consolidation transaction, including, but not limited to, when the terms of the transaction were negotiated,

when the transaction documents were executed, and when the consolidation occurred. Accordingly, the transaction was a consolidation between unrelated parties.

23.     As a result of the consolidation, the assets of Mercy Center passed by operation of state law to Provena Hospitals, a new corporation created as a result of the consolidation transaction.  One such asset passing to Provena Hospitals was Mercy Center's claim for Medicare reimbursement for the loss incurred on consolidation.  Provena Hospitals also became legally responsible for the obligations of Mercy Center by operation of state law. Mercy Center ceased to exist as a result of the consolidation.  At no time did Mercy Center exist concurrently with Provena Hospitals.

24.     Effective October 1, 1995, the three religious congregations that controlled the consolidating hospitals created Provena Health to serve as the sole corporate member of Provena Hospitals.  The mechanism used to create Provena Health was to "retool" Mercy Health Corporation, the entity that had served as Mercy Center's sole corporate member prior to the consolidation.  This avoided the need to make a new filing in the Catholic Directory, which otherwise would have been required to obtain tax exempt status, but otherwise was equivalent to creating a new entity to serve as Provena Hospital's sole corporate member "from scratch."

25.     In completing its Medicare cost report for the year ending November 30, 1997, Mercy Center claimed reimbursement for Medicare's share of the loss on depreciable assets that it had incurred on the consolidation.

26.     After auditing Mercy Center's cost report, the Intermediary disallowed Mercy Center's loss claim.  The Intermediary determined that the loss resulted from a "change of sponsorship" transaction which was not recognized as a change of ownership ("CHOW") for

Medicare purposes under the Secretary's regulations. The Intermediary's audit determination was reflected in an NPR dated August 3, 2000.

## ADMINISTRATIVE APPEAL PROCESS

27.    On January 17, 2001, Mercy Center timely filed its notice of appeal and request for hearing with the PRRB challenging disallowance of its claim for reimbursement for the loss incurred on consolidation pursuant to 42 C.F.R. §§ 405,1835-1841. The amount of Medicare program funds in controversy was approximately $4.6 million. Mercy Center satisfied the jurisdictional requirements set forth in applicable Medicare regulations.

28.    On October 19, 2000, while Mercy Center's appeal was pending before the PRRB, CMS issued a Program Memorandum to its fiscal intermediaries requiring disallowance of loss claims resulting from mergers and consolidations involving non-profit providers based on "continuity of control," and where consideration paid for the assets was considered unreasonable.  The Program Memorandum required the related party determination to be based on a comparison of control over the consolidating entity prior to the transaction with control over the consolidated entity subsequent to the transaction.  In doing so, the Program Memorandum reversed longstanding agency policy related to recognition of gains and losses from consolidations, reflected in section 4502.7 of the Medicare Intermediary Manual and in correspondence from senior agency officials that had interpreted the applicable regulation to require the related party determination to be based on the relationship of the consolidating entities immediately prior to the transaction.  The Program Memorandum also required a consolidation between unrelated parties to be a "*bona fide* sale" before recognition of any related gain or loss, and, based on a definition of that term added to the Provider Reimbursement Manual in May 2000 ("*Bona Fide Sale* Definition"), required related

consideration to be "reasonable." The agency had previously interpreted Medicare regulations to require recognition of a gain or loss if it was incurred on a transaction that was a consolidation and the transaction was between unrelated parties. The agency had not previously applied regulations addressing *bona fide* sales of assets to consolidations, or required that the consideration for the consolidating entity's assets – its liabilities that were assumed by the consolidated entity – be considered "reasonable" or reflect the assets' fair market value.

29.    While Mercy Center's appeal was pending before the PRRB, the Intermediary recognized that its initial determination disallowing the loss as resulting from a change of sponsorship was incorrect. However, rather than recognize the loss, the Intermediary asserted that the loss was not properly reimbursable based on principles included in the Program Memorandum that had been issued by CMS approximately three years after the transaction. The Intermediary asserted that the consolidation was between related parties because there was a "continuity of control" between the non-surviving consolidating entity, Mercy Center, and the new consolidated entity, Provena Hospitals. The Intermediary also asserted that the consolidation was not a *bona fide* sale, as required for recognition of a related loss.

30.    In a decision rendered on February 15, 2008, the PRRB affirmed the Intermediary's determination disallowing Mercy Center's loss, however, based on grounds different from those that had been relied upon by the Intermediary. The PRRB held that because Mercy Center's sole corporate member prior to the transaction, Mercy Health, became Provena Health after the consolidation, and which then served as the sole corporate member of Provena Hospitals, Mercy Center had the same corporate parent before and after the transaction. Accordingly, the PRRB found that the consolidation was a related party

transaction for which Medicare regulations did not recognize gain or loss.  A copy of the PRRB's decision, received by counsel for Mercy Center on February 19, 2008, is attached as Attachment A.

31.     By letter dated March 7, 2008, the CMS Office of the Attorney Advisor advised counsel for Mercy Center that the CMS Administrator would review the PRRB's decision and determine whether that decision should be reversed, affirmed, modified or remanded.  Mercy Center was advised of its right to submit comments.

32.     By letter dated March 14, 2008, Mercy Center advised the CMS Attorney Advisor that the PRRB's decision was incorrect, and that pertinent regulations and agency instructions required recognition of Mercy Center's loss because it resulted from a consolidation between unrelated parties.

33.     On April 15, 2008, relying on the Program Memorandum, the CMS Administrator affirmed the PRRB's decision.  The CMS Administrator found that the consolidation was between related parties because Mercy Health maintained extensive reserve powers over Mercy Center's assets before the transaction, and over those assets after the transaction, as Provena Health.  Additionally, notwithstanding the fact that the consolidated entity, Provena Hospitals, was created as a result of the consolidation, the CMS Administrator asserted that Mercy Center was related to the consolidated entity before and after the consolidation through ownership and continuity of control.  The CMS Administrator also stated that this prevented the consolidation from satisfying requirements for *bona fide* sales of assets, as required, as did the fact that Mercy Center did not receive reasonable compensation for its depreciable assets as part of the consolidation.  A copy of the CMS Administrator's decision is attached as Attachment B.

34.     The CMS Administrator's decision, received on April 23, 2008, constitutes the final administrative decision of the Secretary with respect to Mercy Center's claim for reimbursement for its loss on consolidation.  Mercy Center has exhausted its administrative remedies with respect to its claim.

35.     This Complaint is filed within sixty (60) days of receipt of the CMS Administrator's decision, and is therefore timely.  42 U.S.C.A. § 1395oo(f)(1).

<u>COUNT I</u>

36.     Mercy Center hereby incorporates by reference paragraphs 1 through 35 of this Complaint.

37.     Based upon the record developed before the PRRB in this case ("administrative record"), which will be certified by the CMS Administrator in accordance with 42 U.S.C. § 1395oo(f) and which is incorporated herein by reference, the Secretary's final administrative decision is contrary to the requirements of the Medicare statute because it fails to reimburse Mercy Center for the loss in value of its depreciable assets, which the Secretary has recognized in regulations is a cost actually incurred in providing covered services to Medicare beneficiaries, as required by 42 U.S.C. §§ 1395d(a), 1395f(b) and 1395x(v).

<u>COUNT II</u>

38.     Mercy Center hereby incorporates by reference paragraphs 1 through 37 of this Complaint.

39.     Based upon the administrative record, the CMS Administrator's determination is contrary to requirements of the Medicare statute because it fails to reimburse Mercy Center's loss based on the applicable policies in effect on June 1, 1984, as required by the

Medicare statute.  42 U.S.C. § 1395x(v)(i)(O).  Those policies required recognition of Mercy Center's loss claim.

<p style="text-align:center">COUNT III</p>

40.    Mercy Center hereby incorporates by reference paragraphs 1 through 39 of this Complaint.

41.    Based upon the administrative record, the CMS Administrator's determination is contrary to the Secretary's governing regulation and long-standing interpretations which require reimbursement of a provider's loss incurred on a consolidation with an unrelated corporation.  *See* 42 C.F.R. § 413.134(l); Medicare Intermediary Manual § 4502.7.

<p style="text-align:center">COUNT IV</p>

42.    Mercy Center hereby incorporates by reference paragraphs 1 through 41 of this Complaint.

43.    Based upon the administrative record, the CMS Administrator's determination that the consolidation was between related parties because Provera Health was created by "retooling" the corporate documents for Mercy Health, rather than creating a new corporation "from scratch" is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and is unsupported by substantial evidence in the record as a whole within the meaning of the APA, 5 U.S.C. § 706(2)(A), (E).  *See* 42 U.S.C. § 1395oo(f)(2).

<p style="text-align:center">COUNT V</p>

44.    Mercy Center hereby incorporates by reference paragraphs 1 through 43 of this Complaint.

45.    Based upon the administrative record, the Secretary's determination that the consolidation was between unrelated parties based on control over Provera Hospitals after the

transaction is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and is unsupported by substantial evidence in the record as a whole within the meaning of the APA, 5 U.S.C. § 706(2)(A), (E).  *See* 42 U.S.C. § 1395oo(f)(2).

<div align="center">COUNT VI</div>

46.    Mercy Center hereby incorporates by reference paragraphs 1 through 45 of this Complaint.

47.    Based upon the administrative record, the CMS Administrator's determination that the transaction was not a "*bona fide* sale," as required for recognition of the loss, because Mercy Center did not receive reasonable consideration for its assets is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with the law, and is unsupported by substantial evidence in the record as a whole within the meaning of the APA, 5 U.S.C. § 706(2)(A), (E).  *See* 42 U.S.C. § 1395oo(f)(2).

<div align="center">COUNT VII</div>

48.    Mercy Center hereby incorporates by reference paragraphs 1 through 47 of this Complaint.

49.    Based upon the administrative record, the Secretary's determination violates the APA, 5 U.S.C. §§ 553, 706(D), because it reflects a substantive determination not expressed in any statute or regulation and which was contrary to the Secretary's previous regulatory interpretation and which is void based on the Secretary's failure to comply with notice and comment rulemaking procedures.  *See* 42 U.S.C. § 1395oo(f)(2).

<div align="center">COUNT VIII</div>

50.    Mercy Center hereby incorporates by reference paragraphs 1 through 49 of this Complaint.

51.     Based upon the administrative record, the Secretary's determination violates the Medicare statute,  42 U.S.C. § 1395hh(a) – (b), because it relies on a rule, requirement, or other policy statement changing a legal standard governing Medicare payment for services furnished to program beneficiaries and which is void based on the Secretary's failure to comply with notice and comment rulemaking procedures.

### COUNT IX

52.     Mercy Center hereby incorporates by reference paragraphs 1 through 51 of this Complaint.

53.     Based upon the administrative record, the Secretary's determination violates the requirements of the APA, 5 U.S.C. § 552, because it relies on  a substantive rule or interpretation of general applicability or a statement of general policy that was not stated and published in the Federal Register.

### COUNT X

54.     St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 53 of this Complaint.

55.     The Medicare statute requires the Secretary to publish a list of all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability in the Federal Register at least every three months.  *See* 42 U.S.C. § 1395hh(c)(1).

56.     The *Bona Fide* Sale Definition on which the Secretary relied was a manual instruction, interpretative rule, statement of policy, or guideline of general applicability.

57.     The Program Memorandum on which the Secretary relied (and which incorporated the *Bona Fide* Sale Definition) was an interpretative rule, statement of policy, or guideline of general applicability.

58.     Although the *Bona Fide* Sale Definition and Program Memorandum were issued in May 2000 and on October 20, 2000 respectively, neither was listed in the Federal Register until June 28, 2002.  *See* "Medicare and Medicaid Programs; Quarterly Listing of Program Issuances – Fourth Quarter, 1999 through First Quarter, 2002."  67 Fed. Reg. 43,762, 43,776, 43,784 (June 28, 2002).

59.     Based upon the administrative record, the Secretary's determination violates the Medicare statute, 42 U.S.C. § 1395hh(c)(1), because it relies on a manual instruction, interpretative rule, statement of policy, or guideline of general applicability that was not timely listed in the Federal Register.

## COUNT XI

60.     Mercy Center hereby incorporates by reference paragraphs 1 through 59 of this Complaint.

61.     Based upon the administrative record, the Secretary's determination is prohibited retroactive rulemaking because it reflects application of rules adopted after Mercy Center's loss was incurred, including a rule requiring that, in order for a loss incurred on a consolidation to be recognized by Medicare, the consolidated entity resulting from the transaction not be subject to the control of individuals or organizations who could have significantly influenced or controlled the consolidating entity prior to the transaction, requiring that the consolidation satisfy requirements for *bona fide* sales of assets, requiring a *bona fide* sale to reflect reasonable consideration, and precluding recognition of gains or losses on transactions that occurred on or after December 1, 1997.  63 Fed. Reg. 1379, 1382 (Jan. 9, 1998).

COUNT XII

62.    Mercy Center hereby incorporates by reference paragraphs 1 through 61 of the Complaint.

63.    Based upon the administrative record, the Secretary's retroactive determination constitutes an uncompensated taking of Mercy Center's property without due process of law in violation of the Fifth Amendment of the United States Constitution.

COUNT XIII

64.    Mercy Center hereby incorporates by reference paragraphs 1 through 63 of this Complaint.

65.    Based upon the administrative record, the Secretary's determination is contrary to the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, 1996 U.S.C.C.A.N. (110 Stat.) 847, 857 because it relies on a new rule which is void based on the Secretary's failure to adhere to procedures specified in that law.  5 U.S.C. § 801.  Before a rule can be put into effect, an agency must provide each House of Congress and the Comptroller General with a report, including a copy of the rule and related information.  A "major rule", such as that reflected in the Secretary's determination, cannot be put into effect earlier than sixty days after Congress receives the report, or the rule is published in the Federal Register.

PRAYERS FOR RELIEF

WHEREFORE, Provena Hospitals, successor-in-interest to Mercy Center for Health Care Services, prays:

(a)    For an order reversing and setting aside the decision of the CMS Administrator;

(b)    For an order declaring that Provena Hospitals, successor-in-interest to Mercy Center for Health Care Services, is entitled to $4,665,124 or such other amount of  Medicare reimbursement determined to be due for the loss Mercy Center for Health Care Services incurred on its consolidation with unrelated entities;

(c)    For an order remanding the case to the Secretary with directions that the loss on consolidation incurred by Mercy Center for Health Care Services be reimbursed;

(d)    For interest on the amount in controversy in this appeal, as provided by 42 U.S.C. § 1395oo(f)(2);

(e)    For the costs of this suit incurred by Provena Hospitals, successor-in-interest to Mercy Center for Health Care Services; and

(f)    For such other and further relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

Harold G. Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400
Fax: (202) 408-0640
E-mail: hgbelkowitz@ober.com

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120
Fax: (410) 547-0699
E-mail: remazer@ober.com

Attorneys for Plaintiff, PROVENA
HOSPITALS, successor-in-interest to
MERCY CENTER FOR HEALTH
CARE SERVICES

Dated in Washington, D.C.
this 18th day of June, 2008

**ATTACHMENT A**



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298
Internet: www.cms.hhs.gov/PRRBReview

Suzanne Cochran, Esq., Chairperson
Elaine Crews Powell, CPA
Anjali Mulchandani-West, CPA
Yvette C. Hayes
Michael D. Richards, CPA

Refer to: Case No.:  01-0801
Decision No.:  2008-D18

FEB 1 5 2008

*received*
*2/19/08*
*PGM*

**CERTIFIED MAIL**

Mr. Robert E. Mazer, Esquire
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD  21202-1643

RE:  Mercy Center for Health Care Services
    Provider No.:  14-0174
    FYE - 11/30/1997

Dear Mr. Mazer:

A copy of the Provider Reimbursement Review Board's decision on the above-referenced appeal
is enclosed.  Please see enclosure for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,

Paul J. Crofton, Director
Division of Hearings and Decisions

5 Enclosures
  Final Decision Review and Appeal Information
  Decision
  42 USC 1395oo(f)
  42 CFR 405.1875 and 405.1877

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

2008-D18

**PROVIDER –**
Mercy Center for Health Care Services
Aurora, Illinois


Provider No.: 14-0174



**vs.**


**INTERMEDIARY –**
BlueCross BlueShield Association/
AdminaStar Federal, Inc.

**DATES OF HEARINGS –**
July 16-18, 2003 and June 4, 2007



Cost Reporting Period Ended -
November 30, 1997



**CASE NO.:** 01-0801


## INDEX

| | Page No. |
|---|---|
| Issue........................................................................................................................ | 2 |
| Medicare Statutory and Regulatory Background........................................................ | 2 |
| Statement of the Case and Procedural History.......................................................... | 3 |
| Background of the Consolidation.............................................................................. | 4 |
| Parties' Contentions................................................................................................. | 5 |
| Findings of Fact, Conclusions of Law and Discussion............................................. | 7 |
| Decision and Order.................................................................................................. | 10 |

Page 2                                    CN: 01-0801

ISSUE:

Whether the Intermediary's adjustment disallowing the loss on disposal of depreciable assets through consolidation was proper.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a health care provider.

The Medicare program provides health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare & Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (DHHS) charged with the program's administration. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due providers under Medicare law and interpretative guidelines published by CMS. See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider, and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803. A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo; 42 C.F.R. §405.1835.

Medicare reimbursement is governed by 42 U.S.C §1395x(v)(1)(A) of the Social Security Act. In part, the statute provides that the "reasonable cost" of any service shall be the actual cost incurred excluding any part of such costs found to be unnecessary in the efficient delivery of needed health services. The implementing regulation at 42 C.F.R §413.9 provides that reasonable cost includes all "necessary and proper" costs incurred in furnishing healthcare services, subject to principles relating to specific items of revenue and cost.

Under the Medicare statute, a provider is entitled to claim as a reimbursable cost the depreciation (i.e., the loss of value over time) of property, plant and equipment used to provide health care to Medicare patients. An asset's depreciable value is set initially at its "historical cost," generally equal to the purchase price. 42 C.F.R. §413.134(b)(1). To determine annual depreciation, the historical cost is prorated over the asset's estimated useful life in accordance with one of several methods. 42 C.F.R. §413.134(a)(3).

The calculated annual depreciation is only an estimate of the asset's declining value. If an asset is ultimately sold by the provider for less than the undepreciated basis calculated under

CN: 01-0801

Medicare (equivalent to the "net book value" and equal to the historical cost minus the depreciation previously paid, see, 42 C.F.R. §413.134(b)(9)), then a "loss" has occurred, since the sales price was less than the estimated remaining value. In that event, the Secretary of DHHS (Secretary) assumes that more depreciation has occurred than was originally estimated and, accordingly, provides additional reimbursement to the provider. Conversely, if the asset is sold for more than its undepreciated basis, then a "gain" has occurred, and the Secretary takes back or "recaptures" previously paid reimbursement. 42 C.F.R. §413.134(f)(1).

Where a provider sells several assets for a lump sum sales price the regulation at 42 C.F.R. §413.134(f)(2)(iv) requires the determination of the gain or loss (depreciation adjustment) for each depreciable asset by allocating the lump sum sales price among all of the assets sold in accordance with the fair market value of each asset as it was used by the provider at the time of sale. An appropriate part of the purchase price is allocated to "all of the assets sold" regardless of whether they are depreciable or not.

The regulation providing for gains or losses originally dealt with the disposition of assets through sale, scrapping, trade-in, exchange, donation, demolition, abandonment, condemnation, fire, theft or other casualty. In 1979 CMS extended the depreciation adjustment to "complex financial transactions" not previously addressed in subsection 42 C.F.R. § 413.134(f) by including mergers and consolidations. A statutory merger between unrelated parties was treated as a disposition of assets that would trigger: (1) the revaluation of assets in accordance with 42 C.F.R. §413.134(g), and (2) the realization of gains and losses under the provisions of 42 C.F.R. §413.134(f). However, a statutory merger between related parties would not trigger a gain or loss computation. Likewise, a consolidation between two or more corporations that were unrelated resulted in a depreciation adjustment. No revaluation was allowed if related corporations consolidated. 42 C.F.R. §413.134(l)(3)(ii).

STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Mercy Center for Health Care Services, Inc. (Provider) was a general, acute care hospital located in Aurora, Illinois. Prior to December 1, 1997, it was a not-for-profit-corporation whose sole member was Mercy Health Corporation which was sponsored by The Sisters of Mercy of the Americas. On November 30, 1997, the Provider consolidated with corporations sponsored by Franciscan Sisters of the Sacred Heart and Servants of the Holy Heart, to create Provena Hospitals, a new non-profit corporation. The consolidation provided for the transfer of substantially all of the Provider's assets to Provena Hospitals. In consideration for the acquired assets, Provena Hospitals agreed to assume the Provider's liabilities.

Concurrent with the consolidation, the Provider ceased to exist, and a final or terminating Medicare cost report was submitted. In this cost report, the Provider claimed a loss on the disposal of its depreciable assets resulting from the consolidation. The loss was represented by the difference between the assets acquired by Provena Hospitals and the

Page 4                                    CN: 01-0801

liabilities that it assumed. AdminaStar Federal (Intermediary) reviewed the Provider's
cost report and made an adjustment eliminating the loss.

The Provider appealed the Intermediary's adjustment to the Board pursuant to 42 C.F.R.
§§405.1835-405.1841 and met the jurisdictional requirements of those regulations. The
amount of Medicare funds in controversy is approximately $4,560,457.[1]

The Provider was represented by Robert E. Mazer, Esquire, of Ober, Kaler, Grimes &
Shriver. The Intermediary was represented by Bernard M. Talbert, Esquire, Associate
Counsel, Blue Cross Blue Shield Association.

BACKGROUND OF THE CONSOLIDATION:

On February 6, 1997, a "Memorandum of Understanding and Confidentiality Agreement"
(MOU) was signed on behalf of various entities ultimately involved in the consolidation.[2]
The MOU reflected the parties' intention to continue discussions regarding a Master Co-
Sponsorship Agreement and set forth the process for further negotiations and interim
steps. Further discussions were based on a document entitled "Vision Statement and Co-
Sponsorship Collaboration Conceptual Development."[3]

On July 3, 1997, the parties entered into a Master Affiliation Agreement (Master
Agreement).[4]  The Master Agreement provided for a single Catholic-identified integrated
health care delivery system (System), a new parent organization for the system
(SYSTEM NEWCO), and a single hospital operating company (HOSPITALCO) which
would result from merger, consolidation or asset transfer of the hospitals that were
previously part of one of the three systems.[5]

The closing date of the transaction described in the Master Agreement was to be
October 31, 1997 or such other date agreed to by the parties, but no later than June 30,
1998 (Exhibit I-5 at 34).

On November 26, 1997, Articles of Consolidation were filed with the Illinois Secretary
of State (Exhibit P-3). As a result, effective November 30, 1997, Mercy Center
consolidated with corporations sponsored by Franciscan Sisters of the Sacred Heart and
Servants of the Holy Heart  to create a new corporate entity, Provena Hospitals. By
operation of Illinois law, each of the consolidating entities, including the Provider, ceased

---

[1] Intermediary Position Paper at 1.

[2] Provider's Post-Hearing Brief at 14. Exhibit I-5 at E referencing:  Mercy Center for Health Care
Services, Inc., The Sisters of Mercy of the Americas, Franciscan Sisters Health Care Corporation,
Franciscan Sisters of the Sacred Heart, ServantCor, and Servants of the Holy Heart of Mary.

[3] Provider's Post- Hearing Brief at 14. Exhibit I-5 at F.

[4] Exhibit I-5.

[5] Exhibit I-5 at 3.

CN: 01-0801

appoint two of the six members of the Class D body, and to approve the sale of excess stable patrimony. It had no rights related to the ongoing use of the assets of Provena Hospitals. Therefore continuity of control did not exist with regard to the rights of the Sisters of Mercy.

The Provider also contends that the regulatory requirements for a bona fide sale do not apply to consolidations, nor is there a requirement for "reasonable consideration in order for a consolidation to be a bona fide transaction." The subject transaction was a consolidation under state law; it was not a sale of assets which is a fundamentally different type of transaction. The pertinent regulations make no mention of a requirement that consolidations between unrelated parties be a bona fide sale before a gain or loss can be recognized. Importantly, the Provider was unable to compete in the market place since its facilities were old and run down, it was operating at 50-55 percent capacity, and its financial performance was deteriorating. The Intermediary's assertion that the Provider assets were sold at 42 cents on the dollar does not reflect the assets' deteriorated fair market value.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

After consideration of Medicare law and guidelines, parties' contentions and evidence presented, the Board finds and concludes as follows:

Effective on November 30, 1997 the Provider consolidated with health care corporations sponsored by Franciscan Sisters of the Sacred Heart and Servants of the Holy Heart creating a new corporate entity, Provena Hospitals, with the pre-existing entities ceasing to exist. Under the terms of the transaction, Provena Hospitals acquired all of the assets and assumed all of the liabilities associated with the operation of the Provider and the other consolidating corporate health care entities. The parties agree that the transaction at issue was a consolidation under Illinois State law and that regulation 42 C.F.R. §413.134, "Depreciation: Allowance for Depreciation Based on Asset Costs," is applicable.[10] Section 413.134(1)(3) defines a consolidation as "the combination of two or more corporations resulting in the creation of a new corporate entity."

The Medicare regulation at 42 C.F.R. § 413.134(1)(3) provides for the reimbursement effect of a consolidation, as follows:

> [i]f at least one of the original corporations is a provider, the effect of a consolidation upon Medicare reimbursement for the provider is as follows:

---

[10] While the Board is aware that the regulation on consolidations may be interpreted as applying only to stock transactions, CMS interprets the regulation to apply to non-profit transactions as well. HCFA's Director of the Division of Payment and Reporting Policy, Office of Reimbursement Policy, stated in a 1987 letter that the regulation applied to non-profits. See, Exhibit P-24. In addition, the October 2000 "Clarification of the Application of the Regulations at 42 C.F.R. § 413.134(1) to Mergers and Consolidations Involving Non-profit Providers," HCFA Program Transmittal A-00-76, states that the regulation applies to non-profits; however, "special considerations" apply. See, Exhibit I-20.

*(i) Consolidation between unrelated parties.* If the consolidation is between two or more corporations that are unrelated (as specified in §413.17), the assets of the provider corporation(s) may be revalued in accordance with paragraph (g) of this section.

*(ii) Consolidation between related parties.* If the consolidation is between two or more related corporations (as specified in §413.17), no revaluation of provider assets is permitted.

Accordingly, the initial question to be addressed in this case is whether or not the subject consolidation is a related party transaction. Medicare rules regarding related parties at 42 C.F.R. §413.17, state in relevant part:

(b) *Definitions.* (1) *Related to the provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

(2) *Common Ownership.* Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

(3) *Control.* Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

Based upon an analysis of the facts, the Board concludes that the consolidation is, in fact, a related party transaction as that term is defined and applied under the regulatory provisions of 42 C.F.R. §413.17 and 42 C.F.R. §413.134. Therefore, a revaluation of assets and recognition of a gain or loss as a result of the transaction is not permitted pursuant to 42 C.F.R. §413.134(l)(3)(ii).

The record shows that the consolidation at issue in this case was a multi-tiered transaction. The sponsors' hospitals, clinics, and medical centers were included in Provena Hospitals, while Provena Ventures, Inc. was created to primarily manage insurance products, and Provena Senior Services included the sponsors' long term care and residential facilities. Notably, the pre-transaction sponsors became Provena Health, the sole corporate sponsor or parent of the post-transaction Provena Hospitals.

Unique to this case, as opposed to other consolidation cases that have been before the Board, is the fact that the Provider's relationship with its parent, Mercy Health Care Corporation, remained unchanged throughout the transaction. As discussed above, the three sponsoring congregations created Provena Health as the sole corporate member or parent of Provena Hospitals, which includes the Provider. Provena Health, however, was

Page 9                              CN: 01-0801

created through amendment to the Articles of Incorporation of Mercy Health
Corporation.[11]    Based upon the perpetuity and authority granted a "corporation," Mercy
Health Corporation and Provena Health are the same corporate entity.

Black's Law Dictionary, Fifth Edition defines a "corporation" as follows:

> [a]n artificial person or legal entity created by or under the
> authority of the laws of a state or nation. . . .   Such entity
> subsists as a body politic under a special denomination, which
> is regarded in law as having a personality and existence distinct
> from that of its several members, and which is, by the same
> authority, vested with the capacity of continuous succession,
> irrespective of changes in its membership, either in perpetuity
> or for a limited term of years, and of acting as a unit or single
> individual in matters relating to the common purpose of the
> association, within the scope of the powers and authorities
> conferred upon such bodies by law. . . .

Testimony elicited at the hearing substantiates the proposition that Mercy Health
Corporation continued to exist. The Provider's witness, an attorney qualified by the
Board as an expert on the organization of nonprofit entities under Illinois State law and
the application of Illinois law to changes of ownership transactions, responded to the
following question:

> Q. Under Illinois law, would Provena be considered a new corporation?
>
> A. Provena Health, technically, under Illinois law, would not be considered a new
> corporation.

Transcript (Tr.), July 16, 2003, at 147, Line 13

In summary, Medicare regulations at 42 C.F.R. §413.17 addressing related party
transactions, and those at 42 C.F.R. § 413.134(1)(3) regarding consolidations are clear. If
a consolidation occurs between two or more parties related through common ownership
or control, no revaluation of assets is permitted. With respect to the instant case, Mercy
Health Corporation maintained extensive reserve powers over the Provider prior to
November 30, 1997, the effective date of the consolidation. And, even though the
Provider consolidated with other health care facilities creating a new corporation,
(Provena Hospitals), the Provider was essentially controlled by, and able to negotiate

---

[11] The Provider states: "On the same day, the three congregations. . . created Provena Health through
amendment to the Articles of Incorporation of Mercy Health Corporation. . . .   The attorneys
determined that while they could create a new entity 'from scratch' it would be more expeditious to
"retool" Mercy Health Corporation's corporate documents, including restating the entire substance of its
Articles of Incorporation and creating new bylaws. This would avoid the need for a new filing in the
Catholic Directory which otherwise would have been required to obtain tax-exempt status for the
entity." Provider's Post-Hearing Brief at 16. Exhibit P-4.

prior to the transaction with the same entity that became its controlling parent after the consolidation.

The Board emphasizes that its conclusion in this case does not reflect the Intermediary's continuity of control argument, i.e., that 42 C.F.R. §413.134(l)(3) requires a related party determination to be based upon relationships established after a transaction as well as prior to a transaction. Rather, the Board's findings are based upon the relationship of the Provider to its parent prior to the subject consolidation, albeit, with their parallel move to the Provena system.

DECISION AND ORDER:

The Intermediary's adjustment disallowing the loss claimed by the Provider on the disposal of depreciable assets through consolidation was proper. The Intermediary's adjustment is affirmed.

Board Members Participating:

Suzanne Cochran, Esq.
Elaine Crews Powell, C.P.A
Anjali Mulchandani-West, C.P.A.
Yvette C. Hayes
Michael D. Richards, C.P.A.

FOR THE BOARD:

Suzanne Cochran, Esq.
Chairperson

DATE: **FEB 1 5 2008**

Enclosure

## Final Decision Review and Appeal Information

The Provider Reimbursement Review Board's (Board) decision
becomes final 60 days after the date of receipt by the provider
unless within that time the Administrator of HCFA notifies the
parties of an action taken under the provisions of 42 C.F.R.
§ 405.1875.  If such action is taken, then the Administrator's
decision becomes final 60 days after receipt thereof by the
provider.

Providers are permitted to initiate two actions within specified
time limits.  First, the provider (and/or the intermediary) may
request the Administrator to review a Board decision within 15
days of its receipt.  (See § 405.1875(b)).  Secondly, Section
1878(f) of the Social Security Act ("Act"), 42 U.S.C.
§ 1395oo(f), permits a provider to obtain judicial review of a
final decision of either the Board or the Administrator by filing
a civil action within 60 days of the date on which the provider
receives such decision.  (See also 42 C.F.R. § 405.1877).  For
your convenience, a copy of each of the above-referenced
authorities is enclosed.

Enclosures

**§ 405.1875 Administrator's review.**

(a) *General rule.* (1) Except for a Board determination under § 405.1842 that it lacks the authority to decide an issue, the Administrator, at his or her discretion, may review any final decision of the Board, including a decision under § 405.1873 about the Board's jurisdiction to grant a hearing. The Administrator may exercise this discretion on his or her own motion, in response to a request from a party to a Board hearing or in response to a request from HCFA.

(2) The Office of the Attorney Advisory will examine the Board's decisions, the requests made by a party or HCFA and any submission made in accordance with the provisions of this section in order to assist the Administrator in deciding whether to exercise this review authority.

(b) *Request for review.* A party or HCFA requesting the Administrator to review a Board decision must file a written request with the Administrator within 15 days of the receipt of the Board decision.

(c) *Criteria for deciding whether to review.* In deciding whether to review a Board decision, either on his or her own motion or in response to a request from a party to the hearing or HCFA, the Administrator will normally consider whether it appears that:

(1) The Board made an erroneous interpretation of law, regulation or HCFA Ruling;

(2) The Board's decision is not supported by substantial evidence; or

(3) The case presents a significant policy issue having a basis in law and regulations, and review is likely to lead to the issuance of a HCFA Ruling or other directive needed to clarify a statutory or regulatory provision;

(4) The Board has incorrectly assumed or denied jurisdiction or extended its authority to a degree not provided for by statute, regulation or HCFA Ruling; and

(5) The decision of the Board requires clarification, amplification, or an alternative legal basis for the decision.

(d) *Decision to review.* (1) Whether or not a party or HCFA has requested review, the Administrator will promptly notify the parties and HCFA whether he or she has decided to review a decision of the Board and, if so, will indicate the particular issues he or she will consider.

(2) The Administrator may decline to review a case or any issue in a case even if a party has filed a written request for review under paragraph (b) of this section.

(e) *Written submissions.* (1) Within 15 days of receipt of a notice that the Administrator has decided to review a Board decision, a party or HCFA may submit to the Administrator, in writing:

(i) Proposed findings and conclusions;

(ii) Supporting views or exceptions to the Board decision;

(iii) Supporting reasons for the exceptions and proposed findings; and

(iv) A rebuttal of the other party's request for review or other submissions already filed with the Administrator.

(2) These submissions shall be limited to issues the Administrator has decided to review and confined to the record of the Board hearing.

(3) A party or HCFA, within 15 days of receipt of a notice that the Administrator has decided to review a decision, may also request that the decision be remanded and state reasons for doing so. Reasons for a request to remand may include new, substantial evidence concerning—

(i) Issues presented to the Board; and

(ii) New issues that have arisen since the case was presented to the Board.

(4) A copy of any written submission made under this paragraph shall be sent simultaneously to each other party to the Board hearing and to HCFA, if HCFA has previously—

(i) Requested that the Administrator review a Board decision or filed a written submission in response to a party's request for review.

(ii) Responded to a party's request for review; or

(iii) Submitted material after the Administrator has announced that he or she will review a Board decision.

(f) *Ex parte communications prohibited.* All communications from any of the parties or HCFA about a Board decision being reviewed by the Administrator must be in writing and must contain a certification that copies have been served on the parties and HCFA, as appropriate. The Administrator will not consider any communication that does not meet these requirements or is not submitted within the required time limits.

(g) *Administrator's decision.* (1) If the Administrator has notified the parties and HCFA that he or she has decided to review a Board decision, the Administrator will affirm, reverse, modify or remand the case.

(2) The Administrator will make this decision within 60 days after the provider received notification of the Board decision and will promptly mail a copy of the decision to each party and to HCFA.

(3) Any decision other than to remand will be confined to—

(i) The record of the Board, as forwarded by the Board;

(ii) Any materials submitted under paragraphs (b) or (e) of this section; and

(iii) Generally known facts that are not subject to reasonable dispute.

(4) The Administrator may rely on prior decisions of the Board, the Administrator and the courts, and other applicable law, whether or not cited by the parties and HCFA.

(h) *Remand.* (1) A remand to the Board by the Administrator vacates the Board's decision.

(2) The Administrator may direct the Board to take further action with respect to the development of additional facts or new issues, or to consider the applicability of laws or regulations other than those considered by the Board. The following are not acceptable bases for remand—

(i) Presentation of evidence existing at the time of the Board hearing that was known or reasonably could have been known;

(ii) Introduction of a favorable court case that was either not available in print at the time of the Board hearing or was decided after the Board hearing;

(iii) Change of a party's representation before the Board;

(iv) Presentation of an alternative legal basis concerning an issue in dispute; or

(v) Attempted retraction of a waiver of a right made before or at the Board hearing.

(3) After remand, the Board will take the action requested in the remand action and issue a new decision.

(4) The new decision will be final unless the Administrator reverses, affirms, modifies, or again remands the decision in accordance with the provisions of the section.

[48 FR 45773, Oct. 7, 1983]

# THE SOCIAL SECURITY ACT AS AMENDED - TITLE XVIII

### Section 1878(f)(1) Judicial Review

(f)(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5, United States Code, notwithstanding any other provisions in section 205. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

§ 405.1877  Judicial review.

(a) *General rule.* Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of—

(1) A final decision by the Board; or

(2) Any reversal, affirmance, or modification by the Administrator.

The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b) *Administrator declines to review a Board decision.* If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c) *Administrator does not act after reviewing a Board decision.* If the Administrator notifies the parties that he or

she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under § 405.1875(g)(2).

(d) *Matters not subject to judicial review.* Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in section 1886(d)(7) of the Act and § 405.1804.

(e) *Group appeals.* Any action under this section by providers that are under common ownership or control (see § 413.17 of this chapter) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f) *Venue for appeals.* An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (§ 413.17 of this chapter), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g) *Service of process.* Process must be served as described under 45 CFR part 4.

[48 FR 39636, Sept. 1, 1983, as amended at 48 FR 45774, Oct. 7, 1983; 51 FR 34793, Sept. 30, 1986]

(a)    General rule
Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of--
(1)    A final decision by the Board; or
(2)    Any reversal, affirmance, or modification by the Administrator.
The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b)    Administrator declines to review a Board decision
If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c)    Administrator does not act after reviewing a Board decision
If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under Section 405.1875(g)(2).

(d)    Matters not subject to judicial review
Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in Section 1886(d)(7) of the Act and Section 405.1804.

(e)    Group appeals
Any action under this section by providers that are under common ownership or control (see Section 405.427) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f)    Venue for appeals
An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (Section 405.427), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g)    Service of process
Process must be served as described under 45 CFR Part 4.

(41 FR 52051, Nov. 26, 1976. Redesignated at 42 FR 52826, Sept. 30, 1977 amended at 48 FR 39836, Sept. 1, 1983; 48 FR 45774, Oct. 7, 1983)

# ATTACHMENT B

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



Office of the Attorney Advisor                *rec'd   4/23/08*

APR 2 1 2008

**CERTIFIED MAIL**

Robert E. Mazer, Esquire
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re: <u>Mercy Center for Health Care Services</u>, PRRB Decision No. 2008-D18

Dear Mr. Mazer:

Enclosed is a copy of the Administrator's decision in the above case affirming the decision of the

Provider Reimbursement Review Board. This constitutes the final administrative decision of the

Secretary of the Health and Human Services. Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

                                    Sincerely yours,

                                    Jacqueline R. Vaughn
                                    Attorney Advisor

Enclosure

cc: Bernard M. Talbert, Esquire, Intermediary's Representative

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Decision of the Administrator*

| | |
|---|---|
| **In the case of:** | **Claim for:** |
| **Mercy Center for Health Care Services** | **Provider Cost Reimbursement Determination for Cost Reporting** |
| **Provider** | **Period Ending: 11/30/97** |
| **vs.** | |
| **Blue Cross Blue Shield Association/ AdminaStar Federal, Inc.,** | **Review of:** |
| | **PRRB Dec. No. 2008-D18 Dated: February 15, 2008** |
| **Intermediary** | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f) (1) of the Social Security Act (Act), as amended (42 USC 1395oo (f)). The parties were notified of the Administrator's intention to review the Board's decision. The Provider submitted comments requesting that the Administrator reverse the Board's decision. Accordingly, this case is now before the Administrator for final agency review.

## ISSUE AND BOARD'S DECISION

The issue is whether the Intermediary's adjustment, disallowing the loss on disposal of depreciable assets through consolidation, was proper.[1]

The Board held that the Intermediary's adjustment, disallowing the loss claimed by the Provider on the disposal of depreciable assets through consolidation, was proper.

---

[1] Section 4404 of the Balanced Budget Act of 1997 (Pub. L. 05-33) amended §1861(v)(1)(O)(i) of the Social Security Act to terminate Medicare recognition of gains and losses for depreciable assets resulting from either their sale or scrapping. Conforming modifications to the applicable regulation made December 1, 1997 the effective date for implementing the new rule.

In reaching this determination, the Board held that the consolidation was a related party transaction under the regulatory provisions of 42 C.F.R. § 413.17 and 42 C.F.R § 413.134. The record showed that the Provider's relationship with its parent, Mercy Health Care Corporation, remained unchanged throughout the transaction. Under the terms of the transaction, the three sponsoring congregations (Sisters of Mercy, Franciscan Sisters Health Care and Servants of Holy Heart) created Provena Health as the sole corporate member, or parent, of Provena Hospitals, which included the Provider. Provena Health, however, was created through amendment to the Articles of Incorporation of Mercy Health Corporation. Mercy Health Corporation was the sole corporate member of the Provider. Furthermore, testimony elicited at the hearing substantiated that Mercy Health Corporation continued to exist as Provena Health.[2]

Thus, based on these facts, the Board determined that Mercy Health Corporation and Provena Health were the same corporate entity. Accordingly, a revaluation of the Provider's assets and recognition of the loss as a result of the transaction was not permitted pursuant to 42 C.F.R. § 413.134(l)(3)(ii). The Board noted however, that its conclusion was not based on the Intermediary's "continuity of control" argument, i.e., that 42 C.F.R. § 413.134(l)(3) required a related party determination to be based upon the relationship established after a transaction, as well as prior to a transaction. Rather, the Board based its findings upon the relationship of the Provider to its parent prior to the subject consolidation, albeit, with their parallel move to the Provena system.

## SUMMARY OF COMMENTS

The Provider commented, requesting that the Administrator reverse the Board's decision. The Provider argued that, prior to the consolidation, the parties were unrelated through common ownership or control and therefore, its assets should be revalued. To support the Provider's argument, the Provider cited § 4052.7 of the Medicare Part A Intermediary Manual, which provided an example of consolidating entities, unrelated through common ownership or control prior to the consolidation, which resulted in a gain or loss calculation to the seller.

The Provider also argued that CMS has never required a consolidation between unrelated parties to comply with regulation at § 413.134(f)(2), which addresses *bona fide* sales. According to the Provider, under longstanding Medicare payment policy, a *bona fide* sale does not require that the consideration reflect the fair market value of the assets, or specific negotiations, over price. Therefore, the regulatory

---

[2] Transcript of Oral Hearing (Tr.) July 16, 2003, at 147, Line 13.

definition of fair market value is irrelevant in determining whether a loss resulted from a consolidation between unrelated parties.

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

**I.     Medicare Law and Policy -- Reasonable Costs.**

Section 1861(v)(1)(A) of the Social Security Act establishes that Medicare pays for the reasonable cost of furnishing covered services to program beneficiaries, subject to certain limitations. This section of the Act also defines reasonable cost as "the cost actually incurred; excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." The Act further authorizes the Secretary to promulgate regulations establishing the methods to be used and the items to be included in determining such costs. Consistent with the statute, the regulation at 42 C.F.R. § 413.9 states that all payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries.

**A. Capital-Related Costs.**

Reasonable costs include capital-related costs. Consistent with the Secretary's rulemaking authority, the Secretary promulgated 42 C.F.R. § 413.130, which lists capital-related costs that are reimbursable under Medicare. Capital-related costs under Medicare include depreciation, interest, taxes, insurance, and similar expenses (defined further in 42 C.F.R. § 413.130) for plant and fixed equipment, and for movable equipment.

Title VI of the Social Security Amendments of 1983[3] added §1886(d) to the Act and established the inpatient prospective payment system (IPPS) for reimbursement of inpatient hospital services provided to Medicare beneficiaries. Under this system, hospitals are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge according to a list of diagnosis-related groups. Reimbursement under the prospective payment rate is limited to inpatient operating costs. The Social Security Amendments of 1983[4]

---

[3] Pub. L. 98-21.
[4] Section 601(a) (2) of Pub. L. 98-21.

4

amended subsection (a)(4) of §1886 of the Act to add a last sentence which specifies that the term "operating costs of inpatient hospital services" does not include "capital-related costs (as defined by the Secretary for periods before October 1, 1986)....)" That provision was subsequently amended until finally, §4006(b) of Omnibus Budget Reconciliation Act (OBRA) 1987 revised §1886(g)(1) of the Act to require the Secretary to establish a prospective payment system for the capital-related costs of IPPS hospitals for cost reporting periods beginning in fiscal year (FY) 1992.

### 1. Depreciation.

For cost years prior to the implementation of capital PPS, pursuant to the reasonable cost provision of §1861(v)(1)(A) of the Act, the Secretary promulgated regulations on the payment of capital costs, including depreciation. Generally, the payment of depreciation is based on the valuation of the depreciable assets used for rendering patient care as specified by the regulation. The Secretary explained, regarding the computation of gains and losses on disposal of assets, that:

> Medicare reimburses providers for the direct and indirect costs necessary to the provision of patient care, including the cost of using assets for inpatient care. Thus, depreciation of those assets has always been an allowable cost under Medicare. The allowance is computed on the depreciable basis and estimated useful life of the assets. When an asset is disposed of, no further depreciation may be taken on it. However, if a gain or loss is realized from the disposition, reimbursement for depreciation must be adjusted so that Medicare pays the actual cost the provider incurred in using the asset for patient care.[5]

Basically, when there is a gain or loss, it means either that too much depreciation was recognized by the Medicare program resulting in a gain to be shared by Medicare, or insufficient depreciation was recognized by the Medicare program resulting in a loss to be shared by the Medicare program. An adjustment is made so that Medicare pays the actual cost the provider incurred in using the asset for patient care.

Although a gain or loss is recognized in the year of the disposal of the asset, the determination of Medicare's share of that gain or loss is attributable to the cost reporting periods in which the asset was used to render patient care under the Medicare program. Accordingly, although the event of the disposal of the asset may occur after the implementation of capital–PPS, a portion of the loss or gain may be

---

[5] 44 Fed. Reg. 3980 (Jan. 19, 1979).

attributable to cost years paid under reasonable costs and prior to the implementation of capital-PPS.

The regulation at 42 C.F.R. § 413.130 explains, <u>inter alia</u>, that:

> (a) *General rule*.   <u>Capital related costs … are limited to</u>:
> (1) <u>Net depreciation expense as determined under</u> §§ 413.134, 413.144, and 413.149, <u>adjusted by gains and losses realized from the disposal of depreciable assets under 413.134(f)</u>…. (Emphasis added.)

The regulation specifies that only certain events will result in the recognition of a gain or loss in the disposal of depreciable assets.   The Secretary explained in 1976 proposed amendments to the regulation clarifying and expanding existing policy on the recognition of gains and losses, that:

> The revision would describe the various types of disposal recognized under the Medicare program, and would provide for the proper computation and treatment of gains and losses in determining reasonable costs.[6]

In adopting the final rule, the Secretary again explained that:

> Existing regulations contain a requirement that any gain or loss realized on the disposal of a depreciable asset must be included in Medicare allowable costs computations…. The regulations, however, specify neither the procedures for computation of the gain or loss, nor the methods for making adjustment to depreciation.   These amendments provide the rules for the treatment of gain or loss <u>depending upon the manner of disposition of the assets</u>.[7] (Emphasis added.)

These rules have been set forth at 42 C.F.R. § 413.134(f), which explains the specific conditions under which the disposal of depreciable assets may result in a gain or loss under the Medicare program.   This section of the regulation states:

---

[6] 41 Fed. Reg. 35197 (Aug. 1976) "Principles of Reimbursement for Provider Costs: Depreciation: Allowance for the Depreciation Based on Asset Costs." (Proposed rule.)

[7] 44 Fed. Reg. 3980 (1979), "Principles of Reimbursement for Provider Costs."(Final rule.)

(1) *General*. <u>Depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty.</u> If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost is limited to the amount of depreciation previously included in Medicare allowable costs. The amount of a loss to be included is limited to the undepreciated basis of the asset permitted under the program. <u>The treatment of the gain or loss depends upon the manner of disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section</u> ....(Emphasis added.)

The method of disposal of assets set forth at paragraph (f)(2) through (6) is set forth as follows. Paragraph (f) (2) addresses gain and losses realized from the *bona fide* sale of depreciable assets and states:

> *Bona fide sale or scrapping*. (i) Except as specified in paragraph (f)(3) of this section, gains and losses realized from the <u>bona fide</u> sale or scrapping of depreciable assets are included in the determination of allowable cost only if the sale or scrapping occurs while the provider is participating in Medicare.... (Emphasis added).

With respect to paragraph (f) (2) and the *bona fide* sale of a depreciable asset, § 104.24 of the Provider Reimbursement Manual (PRM) states that:

> A *bona fide* sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is ... negotiated by unrelated parties, each acting in its own self interest.[8]

With respect to assets sold for a lump sum, paragraph (f) (2) (iv) specifies:

> If a provider sells more than one asset for a lump sum sales price, the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset as it was used by the provider at the time of sale. If the buyer and seller cannot agree on an allocation of the sales price, or if they do agree but there is

---

[8] Trans. No. 415 (May 2000) (clarification of existing policy).

insufficient documentation of the current fair market value of each asset, the intermediary for the selling provider will require an appraisal by an independent appraisal expert to establish the fair market value of each asset and will make an allocation of the sale price in accordance with the appraisal.

Paragraph (f)(3) addresses gains or losses realized from sales within one year after the provider terminates from the program, while 42 C.F.R. § 413.134(f)(4) addresses exchange, trade-in, or donation,[9] of the asset stating that: "[g]ains or losses realized from the exchange, trade-in, or donation of depreciable assets are not included in the determination of allowable cost." Finally, paragraph (f)(5) explains the treatment of gains and losses when there has been an abandonment (permanent retirement) of the asset, and paragraph (f)(6) explains the treatment when there has been an involuntary conversion, such as condemnation, fire, theft, or other casualty.

## 2. Revaluation of Assets.

Historically, as reflected in the regulation, the disposal of a depreciable asset used to render patient care may result in two separate and distinct reimbursement events: 1) the calculation of a gain or loss for the prior owner and 2) a revaluation of the depreciable basis for the new owner. While the determination of gains and losses is generally only of interest to the prior owner,[10]  the new owner in the same transaction is interested in the determination of when Medicare will allow the revaluation of depreciation for purposes of calculating the new owner's depreciation expense.

This latter issue, on the revaluation of assets, was the subject of significant litigation for the Medicare program regarding complex transaction and resulted in agency rulemaking on the subject. In response to litigation, the regulations at 42 C.F.R. §413.134(l)(1996)[11] were promulgated to address longstanding Medicare policy

_____

[9] A donation is defined in 42 C.F.R. § 413.134(b)(8). An asset is considered donated when the provider acquires the assets without making payment in the form of cash, new debt, assumed debt, property or services. Section 4502.12 of the Intermediary Manual states that when a provider is donated as an ongoing facility to an unrelated party, there is no gain/loss allowed to the donor. The valuation of the assets to the donor depends upon use of the assets prior to the donation.

[10] While this is the general rule, the new owner can also have an interest in the gain or loss, when the new owner is to acquire the Medicare receivables for the terminating cost report along with the depreciable assets.

[11] Originally codified at 42 C.F.R. § 405.415(l).

regarding depreciable assets exchanged for capital stock, statutory mergers and consolidation. Concerning the valuation of assets, the regulation states that:

> (1) *Transactions involving provider's capital stock*—(1) *Acquisition of capital stock of a provider.* If the capital stock of a provider is acquired, the provider's assets may not be revalued. For example, if Corporation A purchases the capital stock of Corporation B, the provider, Corporation B continues to be the provider after the purchase and Corporation A is merely the stockholder. Corporation B's assets may not be revalued.

> ****

> (3) *Consolidation.* A consolidation is the combination of two or more corporations resulting in the creation of a new corporate entity. If at least one of the original corporations is a provider, the effect of a consolidation upon Medicare reimbursement for the provider is as follows:

> (i) *Consolidation between unrelated parties.* If the consolidation is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the provider corporation(s) may be revalued in accordance with paragraph (g) of this section.

> (ii) *Consolidation between related parties.* If the consolidation is between two or more related corporations (as specified in § 413.17), no revaluation of provider assets is permitted. (Emphasis added.)[12]

## B. Related Organizations

The regulation at 42 C.F.R. § 413.134 references the related organization rules at 42 C.F.R. § 413.17. The regulation at 42 C.F.R. § 413.17, states, in pertinent part:

> (b) *Definitions. (1) Related to the provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.
> (2) *Common ownership.* Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

---

[12] See also 44 Fed. Reg. 6912-14 (Feb. 5, 1979).

(3) *Control.* Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

Consistent with the Act and the regulations, the above principles are set forth in the Provider Reimbursement Manual (PRM), which provides guidelines and policies to implement Medicare regulations for determining the reasonable cost of provider services. In determining whether the parties to a transaction are related, the PRM at § 1004, et seq., establishes that the tests of common ownership and control are to be applied separately, based on the facts and circumstances in each case. With respect to common ownership, the PRM at § 1004.1 states:

> This rule applies whether the provider organization or supplying organization is a sole proprietorship, partnership, corporation, trust or estate, or any other form of business organization, proprietary or nonprofit. In the case of nonprofit organization, ownership or equity interest will be determined by reference to the interest in the assets of the organization (e.g., a reversionary interest provided for in the articles of incorporation of a nonprofit corporation).[13]

Concerning the definition of control, the PRM at § 1004.3 states: "[t]he term 'control' includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised." The concept of "continuity of control" is illustrated at § 1011.4 of the PRM, in Example 2 which reads as follow:

> The owners of a 200-bed hospital convert their facility to a nonprofit corporation. The owners sell the hospital to a non-profit corporation under the direction of a board of trustees made up of former owners of the proprietary corporation. Both corporations are considered related organizations; therefore, the asset bases to the nonprofit corporations remain the same as contained in the proprietary corporation's records, and there can be no increase in the book value of such assets.

The related party organization was further explained in HCFA Ruling 80-4 which adopted the Eighth Circuit Court of Appeals' decision in Medical Center of Independence v. Harris, 628 F.2d 1113 (8th Cir. 1980).[14]    The Ruling pointed out

---

[13] Trans. No. 272 (Dec. 1982) (clarifying certain ambiguous language relating to the determination of ownership or equity interest in nonprofit organizations).

[14] In Medical Center of Independence v. Harris, supra, the court held that a medical center and a management corporation from which it leased and operated a hospital facility were related organizations within the meaning of 42 C.F.R. §413.17, where

that the applicability of the related organization rule is not necessarily determined by the absence of a relationship between the parties prior to their initial contracting, although those factors are to be considered. The applicability of the rule is determined by also considering the relationship between the parties according to the rights created by their contract. The terms of the contracts and events which occurred subsequent to the execution of the contract in that case had the effect of placing the provider under the control of the supplier.

## C. Non-Profit Corporations and the Related Parties and Disposal of Depreciable Asset Regulations.

### 1. Program Memorandum A-00-76.

To clarify the application of 42 C.F.R. §413.134(l) to non-profit providers with respect to the related party rules and the rules on the disposal of depreciable assets, CMS issued Program Memorandum (PM) A-00-76, dated October 19, 2000. This PM applies the foregoing regulations to the situation of non-profit corporations. In particular, this PM noted that non-profits differ in significant ways from for–profit organizations. Non-profit organizations typically do not have equity interests (i.e., shareholders, partners), exist for reasons other than to provide goods and services for a profit, and may obtain significant resources from donors who do not expect to receive monetary repayment of, or return, on the resources they provide. These differences, among others, cause non-profit organizations to associate or affiliate through mergers or consolidations for reasons that may differ from the traditional for-profit merger or consolidations. In contrast, the regulations at 42 C.F.R. § 413.134(l) were written to address only for-profit mergers and consolidations.

The PM A-00-76 also noted that, unlike for-profit mergers or consolidations, which often involve a dispatching of the former governing body and/or management team,

---

the management corporation had purchased the assets of the hospital and had entered into a 15 year lease agreement with the hospital, with a management agreement to run concurrently with the lease, and where six employees of the management corporation were elected as directors of the hospital, and two were elected as hospital officers. The court upheld the district court's finding that the management corporation had the power, directly or indirectly, significantly to influence or direct the actions or policy of the hospital, and rejected a contention that potential influence, in the absence of a past and present exercise of influence, is insufficient to warrant a finding of control. The court stated that, while the absence of any prior relationship between the parties is relevant to the issue of control, it should not automatically lead to the conclusion that the related party principle does not apply.

many non-profit mergers and consolidations involve the continuation, in whole or part, of the former governing board and/or management team. Thus, in applying the related organization principles of 42 C.F.R. § 413.17, CMS stated that consideration must be given to whether the composition of the new board of directors, or other governing body and/or management team include significant representation from the previous board or management team. If that is the case, no real change of control of the assets has occurred and no gain and loss may be recognized as a result of the transaction. This PM A-00-76 recognized that, inter alia, certain relationships formed as a result of the consolidation of two entities constituted a related party transaction for which a loss on the disposal of assets could not be recognized. The PM A-00-76 stressed that "between two or more corporations that are unrelated" should include the relationship between the constituent hospitals and the surviving or consolidating entity. Consequently, the PM A-00-76 states that:

> [W]hether the constituent corporations in a merger or consolidation are or are not related is irrelevant; rather the focus of the inquiry is whether significant ownership or control exists between a corporation that transfers assets and the corporation that receives them.

The PM A-00-76 stated that the term "significant," as used in PM A-00-76 has the same meaning as the term "significant" or "significantly," in the regulations at 42 C.F.R. § 413.17 and the PRM at Chapter 10. Important considerations in this regard include that the determination of common control is subjective; each situation stands on its own merits and unique facts; a finding of common control does not require 50 percent or more representation; there is no need to look behind the numbers to see if control is actually being exercised, rather the mere potential to control is sufficient.

In addition, PM A-00-76 stated that many non-profit mergers and consolidations have only the interests of the community at large to drive the transaction. This community interest does not always involve engaging in a *bona fide* sale or seeking fair market value of assets given. Rather, the assets and liabilities are simply combined on the merger/consolidated entities books. The merged/consolidated entity may, or may not, record a gain or loss resulting from such a transaction for financial reporting purposes. However, notwithstanding the treatment of the transaction for financial accounting purposes, no gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a *bona fide* sale as required by the regulation at 42 C.F.R. § 413.134(l) and as defined in the PRM at §104.24.

The PM A-00-76 further explained that, in evaluating whether a *bona fide* sale has occurred with respect to mergers or consolidation between or among non-profits

entities, a comparison of the sale price with the fair market value of the assets is a required element of the analysis. A large disparity between the sales price and the fair market value of the assets sold indicates the lack of a *bona fide* sale.

Notably, the Administrator finds that the requirement that the term "between related organizations" includes an examination of the relationship before and after a transaction of assets under 42 C.F.R. §413.417[15] was applied as early as 1977 by the agency in evaluating whether accelerated depreciation would be recaptured. The agency decided that "when the termination of the provider agreement results from a transaction between related organizations and the successor provider remains in the health insurance program and its asset bases are the same as those of the terminated providers, health insurances reimbursement is equitable to all parties." Thus, the depreciation recovery provisions would not be applied.[16] The agency looked specifically at whether, in a related party transaction, the control and extent of the financial interest remained the same for the owners of the provider before and after the termination.[17] Thus, this interpretation of the related party rules as requiring an examination of the relationship before and after the transfer of assets is consistent with early Medicare policy and HCFA Ruling 80-4.

This interpretation, that "between related organizations" must include an examination of all parties to the transaction, both before and after, is also consistent with the reality of a transaction involving the merging of two or more entities. For example:

> Corporation A and Corporation B, both non-profit providers, are combined by statutory merger with Corporation A surviving. Corporations A and B were unrelated prior to the transaction, each being controlled by its respective Board of ten Directors. After the merger, Corporation A's new ten member Board of Directors includes five individuals that served on Corporation B's pre-merger board. Thus, Corporation A's new Board of Directors includes a significant number of individuals from both of the former entities' boards. Because no significant change of control of the assets of former Corporation B has occurred, the transaction as between Corporation A and Corporation B is deemed to be between related parties and no gain or loss will be recognized as a result of the transaction. Hence,

---

[15] Originally codified at 42 C.F.R. § 405.427.

[16] 42 Fed. Reg. 45897 (Sept. 15, 1977).

[17] 42 Fed. Reg. 45897, 45898 (Sept. 15, 1977) (Recovery of excess cost resulting from the use of accelerated depreciation when termination of provider agreement results from transaction between related organizations).

> Medicare reasonably examines the relationship between the merging corporations and the surviving corporation and recipient of the Medicare depreciable assets to determine whether the transfer involved a related party transaction.[18]

Therefore, in determining whether a provider will be reimbursed for depreciation expenses under Medicare, the Administrator finds that CMS applies a two-prong test. The first question is whether the parities are "related parties" or "unrelated parties" under the Medicare regulations. If the parties are related, they cannot engage in a *bona fide* sale and the analysis ends. If the parties are unrelated, however, the second question is whether the parties engaged in a *bona fide* sale. If the parties engaged in a *bona fide* sale, then a reimbursement for adjusted depreciation cost is proper.

## 2. The Intermediary CHOW Manual and APB No. 16.

The Intermediary Manual, Chapter 4000, et seq., also addresses changes of ownership (CHOW) for purposes of Medicare certification and reimbursement. These sections provide guidelines based on Medicare law, regulations and implementing instructions for use by the Medicare intermediaries and providers on the reimbursement implications of various types of changes of provider organizations transactions or CHOWs. Section 4502 explains that the first review of a CHOW transaction is to determine the type of transaction which occurred as the Medicare program has developed specific policies on the reimbursement effect of various types of CHOW transactions which may be different from treatment under generally accepted accounting principles or GAAP. Section 4502.1, list the various types of provider organizational structures and included as one possible type of provider organization are corporations.

In defining a Corporation, § 4502.1 explains that a corporation is a legal entity which enjoys the rights, privileges and responsibilities of an individual under the law. An interest in a corporation is represented by shares of stock in proprietary situations (stockholders) or membership certificates in non-stock entities (members).

Among the various types of provider structures and transactions recognized by Medicare are mergers, consolidations, and corporate reorganizations at § 4502. Section 4502.6 describes a statutory merger as the combination of two or more corporations pursuant to the law of the State involved, with one of the corporations surviving the transaction. Medicare permits a revaluation of the assets acquired in a statutory merger between unrelated parties, when the surviving corporation is a

---

[18] Program Memorandum A-00-76 at p.3.

provider. If the surviving corporation is a provider or a related organization to the provider – such as a chain home office, the assets acquired can be revaluated. However, the merger of a non-provider corporation into a provider corporation is not a change in ownership for the provider corporation and as such does not result in the revaluation of the assets of the provider corporation.

In the instance of reorganization, CMS examines, inter alia, the parties before and after the transaction in determining that the transfer of assets involved a related party transaction.

Section 4508.11 of the Intermediary Manual,[19] in addressing stock corporations states that, Medicare program policy places reliance on the generally accepted accounting principles or GAAP, as expressed in Accounting Principles Bulletin (APB) No. 16 in the reevaluation of assets and gain/loss computation processes for Medicare reimbursement purposes. While in certain areas, Medicare program policy deviates from that set forth in GAAP,[20] Intermediaries are instructed to refer to the principles outlined in the CHOW manual which specify when reference to APB No. 16 is in accordance with the current Medicare policy.[21]

Generally, APB No. 16 suggests two approaches to the treatment of assets when there is a business combination involving stock corporations: the pooling method and the purchase method. Historically, a combination of business interest was characterized as either a "continuation of the former ownership" or "new ownership." A continuation of ownership was accounted for as a pooling of interest. The pooling of interest method accounts for business combinations as the uniting of the ownership interests of two or more companies. No acquisition is recognized because the combination is accomplished without disbursing resources of the constituents and ownership interests continue. The pooling of interests method results in no revaluation of assets or recording of gains or losses. In contrast, "new ownership" is accounted for as a purchase. The purchase method accounts for a business combination as the acquisition of one company by another and is treated as

---

[19] Section 4504.1 states that: "[W]here Medicare instructions are silent as to the valuation of consideration given in an acquisition, rely upon generally accepted accounting principles. APB No. 16 discusses valuation methods of consideration given for assets acquired in business combinations."

[20] For example, Medicare will not recognize a revaluation/gain or loss due to a transfer of stock or in the case of a "two-step" transaction (i.e., the transfer of stock, than the transfer of the depreciable assets).

[21] Financial Accounting Standards Board (FASB) No. 141 superseded APB No. 16 effective June 2001. However, at the present, not-for-profit (NFP) organizations are excluded from the scope of FASB No. 141.

purchase or sale. Thus, APB No. 16 is similar to the PM, in that both recognize and treat the pooling of interests in a business combination as an event resulting in no gain or loss, while recognizing and treating a bona fide purchase or sale in a business combination as an event resulting in a gain or loss.

**D. Similarities of Internal Revenue Service Principles and Medicare Reimbursement Principles When Entities Consolidate.**

This policy of not recognizing a gain or loss when the transaction is between related parties, whether it constitutes a reorganization or consolidation, is also consistent with Internal Revenue Service (IRS) rules on the non-recognition of a gain or loss when a statutory reorganization has been determined to have occurred.   Relevant to this case, while the Medicare rules may diverge from IRS rules and Medicare policy is not bound by IRS policy, IRS policy often reflects rationale underlying the establishment of similar policies under Medicare.[22] In fact, in setting forth principles applicable to the recognition of the gain or a loss, CMS has in the past recognized the similarity of the Medicare principles and the IRS principles and has often explicitly stated when such Medicare policy agrees or diverges from IRS treatment.[23]

Under IRS rules, some consolidations are considered statutory reorganizations and subject to the non-recognition of a gain or loss.   The terms reorganization and consolidation are not mutually exclusive terms under IRS rules. Medicare policy similarly indicates that they are not mutually exclusive terms under Medicare rules. That is, consolidations and mergers may in fact constitute in essence, reorganizations and reorganizations may involve more than one corporation.[24]   For example, a consolidation where the predecessor corporation board continues significant control in the new corporation board is treated the same as a

---

[22] See, e. g., *Guernsey v. Shalala*, 514 U.S. 1232 (1995), analogizing Medicare rules to IRS rules in citing to *Thor Power Tools v. Commissioner*, 439 U.S. 522 (1979).

[23] See, e.g., 44 Fed. Reg. 3980 (Jan. 19, 1979) ("If a provider trades in or exchanges an asset, no gain or loss is included in the computation of allowable cost.  Instead, consistent with the Internal Revenue Service (IRS), the undepreciated value of the traded asset, plus any additional assets transferred to acquire the new assets, are used as the basis for depreciation of the new asset under Medicare"; 48 Fed. Reg. 37408 (Aug. 18, 1983) (finding that it was not appropriate for the Medicare program to use IRS accelerated costs recovery system for Medicare purposes and deleting IRS useful life guidelines).

[24] See also Black's Law Dictionary definition of a reorganization used interchangeably with merger and consolidation("A reorganization that involves a merger or consolidation under a specific State statute.")

reorganization for Medicare reimbursement purposes and no gain or loss is recognized. However, for example, where the predecessor corporation board does not continue significant control in the new corporation board, a gain or loss will be recognized for Medicare reimbursement purposes.

Similar to Medicare rules, the IRS does not allow the recognition of the gain or loss when there is a reorganization, inter alia, because no gain or loss has in fact been realized. As the courts have noted:

> The principle under which statutory reorganizations are not considered taxable events is that no substantial change has been affected either in the nature or the substance of the taxpayer's capital position, and no capital gain or loss has actually been realized. Such a reorganization contemplates a continuity of business enterprise and a continuity of interest and control accomplished [in this instance] by an exchange of stock for stock.[25] (Emphasis added.)

Similarly, the courts have stated that the underlying purpose of the IRS provisions that find no gain or loss when there is a reorganization was twofold: "1) to relieve certain types of corporate reorganizations from taxation which seemed oppressively premature and 2) to prevent taxpayer's from taking losses on account of wash sales and other fictitious exchanges."[26] Finally, as the Supreme Court found in *Groman v. Commissioners*, 302 U.S 82, 87 (1937), certain transactions speak for themselves, regardless of how they might be cast. As the Supreme Court observed: "If corporate A and B transfer assets to C, a new corporation, in exchange for all of C's stock, the stock received is not a basis for calculation of a gain on the exchange... A and B are so evidently parties to the reorganization that we do not need [the IRS code] to inform us of the fact." In sum, the purpose of these provisions is "to free from the imposition of an income tax purely 'paper profits or losses' wherein there is no

---

[25] *Commissioners of IRS v. Webster Estates*, 131 F. 2d 426, 429 (2nd Cir.1942), citing *Helvering v. Schoellkopf*, 100 F. 2d 415 (2nd Cir. 1938). While the foregoing IRS cases illustrate the continuity of interest, the Administrator notes that the Medicare program does not recognize a loss on sale as a result of a stock transfer regardless of the relationship between the parties. Case law also shows that term "continuity of interest" as provided in the IRS regulation is at times used interchangeably with the term "continuity of control." See e.g. *New Jersey Mortgage and Title Co. v. Commissioner of the IRS*, 3 T. C. 1277 (1944); *Detroit–Michigan Stove Company v. U.S.*. 128 Ct. Cl. 585 (1954).

[26] *C.H. Mead Coal Co. v. Commissioners of IRS*, 72 F. 2d 22, 27-28 (4th Cir. 1934) (analyzing early sections of the code).

realization of gain or loss in the business sense but merely the recasting of the same interests in a different form."[27]

The IRS rules also deny gains or losses from the sale or exchange of property between related parties. In explaining the rationale for this tax law provision, the court in *Unionbancal Corporation v. Commissioner*, 305 F. 3d 976 (9th Cir. 2001), explained that:

> This limitation on deductions for transfers between related parties, protects the fisc against sham transactions and manipulations without economic substance. Not infrequently though, there are honest and important non-tax reasons for sales between related parties, so it's important to fairness to preserve the pre-sale basis where loss on the sale itself isn't recognized for tax purposes. Otherwise the statute would be a heads-I-win, tails-you-lose provision for the IRS: the seller can't take the loss, but the IRS calculates the buyer's gain on resale using the lower basis.

Consequently, one purpose of the IRS policy is to prevent the claiming of a gain or loss when no such event has in fact occurred. Similarly, the related party rules under Medicare, in holding that there is no recognition of a gain or loss when there is a reorganization, or consolidation between related parties, is to avoid the payment of costs not actually incurred by the parties. An overarching principle applicable under the Medicare statute and regulation, with which all reasonable cost regulations must be in accord, is the principle that Medicare will only share in costs actually incurred by the provider. Consistent with IRS rules which recognize that no cost has been incurred under the foregoing facts, Medicare similarly does not find that the provider has incurred an actual cost for purposes of Medicare reimbursement under such facts.

## II. Finding of Facts and Conclusion of Law.

### A. Consolidation between related parties.

In this case, the record shows that during the cost year at issue, the Provider, a general acute care hospital, was a Catholic-sponsored not-for-profit corporation. The sole corporate member of the Provider was Mercy Health Corporation (Mercy),

---

[27] *Paulsen ET UX v. Commissioner*, 469 U.S. 131 (9th Cir. 1985) citing *Southwest Natural Gas Co. v. Commissioner*, 189 F. 2d 332, 334 (5th Cir. 1951), cert. denied, 342 U.S. 860 (1951) (quoting *Commissioner v. Gilmore's Estate*, 130 F. 2d 791, 794 (3rd Cir. 1942)).

which was sponsored by The Sisters of Mercy of the Americas, Regional Community of Chicago ("Sisters of Mercy").[28]   Two other Catholic-sponsored health care "Systems" that were parties to the agreement  that operated acute care hospitals were Franciscan Sisters Health Care Corporation[29] ("Franciscan Health") sponsored by Franciscan Sisters of the Sacred Heart (herein referred to as "Franciscan Sisters") and ServantCor,[30] sponsored by Servants of the Holy Heart of Mary herein referred to as "Servants." Thus, the three Systems involved in the transaction were "Mercy" (parent of the Provider), "Franciscan Health" and ServantCor which were also referred to in the transaction as the "Systems parties." The three sponsoring organizations were "Sisters of Mercy" (sponsor of the Provider's Parent), "Franciscan Sisters" and "Servants", which were also referred to in the transaction as the "Sponsoring parties"

In early 1997, the three Sponsoring parties determined that it would be prudent to create and integrated health care system through the consolidation of the assets and functions of their acute care hospital facilities.   On February 6, 1997, a non-binding Memorandum of Understanding and Confidentiality Agreement (MOU) was signed on behalf of various entities that were part of the Sponsoring parties. The MOU reflected the parties' intention to continue discussions regarding a Master Co-Sponsorship Agreement and set forth the process for further negotiations and interim steps.  The participants intended to complete negotiation and due diligence, obtain required approvals, and execute the Master Co-Sponsorship Agreement by July 1, 1997.[31]   Further discussions would be based on a document entitled "Vision Statement and Regional Co-Sponsorship Collaboration Conceptual Development."[32]

---

[28] Provider's Final Position Paper at 2, Volume 1 of 2.

[29] Franciscan Sisters Health Care Corporation included Saint Joseph Medical Center in Joliet, Illinois; Saint Joseph Hospital in Elgin, Illinois; Saint Therese Medical Center in Waukegan, Illinois; United Samaritan Medical Center; Logan and Sager campuses in Danville, Illinois; and Villa Franciscan Nursing Home in Joliet, Illinois (as well as certain facilities in Indiana). See Provider's Exhibit P-5.

[30] ServantCor System included Covenant Medical Center in Champaign, Illinois and Saint Mary's Hospital in Kankakee, Illinois, as well as, a number of nursing homes and residential facilities including Our Lady of Victory Nursing Home in Bourbannais, Illinois; Saint Anne Center in Rockford, Illinois; Saint Anne Place in Rockford, Illinois; Saint Joseph Home for the Aged; and Saint Vincent Support and Community Living in Freeport, Illinois; and Heritage Village in Kankakee, Illinois; as well as, their other proprietary, non-provider businesses including Personal Care Health Management, which includes Personal Care HMO.

[31] Intermediary's Exhibit I-5.

[32] Provider's Post-Hearing Brief at 14.  Intermediary's Exhibit I-5.  Intermediary's Position Paper at 4.

On July 3, 1997, the parties entered into a Master Affiliation Agreement (Master Agreement).[33]  The Master Agreement provided for a single Catholic identified integrated healthcare and human services delivery system; a not-for-profit entity that would serve as its parent organization (later named Provena Health); and a single hospital operating company, which would result from the merger, consolidation or asset transfer of hospitals that were previously part of one of the three Systems.[34] The closing date of the transaction described in the Master Agreement was to be October 31, 1997, or such other date agreed to by the parties, but no later than June 30, 1998.[35]

The Master Agreement provided that the Sponsoring parties and Systems parties entered into the memorandum of understanding and confidentiality agreement to effect a "commonality of ownership" and control between them which will permit an integrated affiliation of their respective organization. Notably, the Master Agreement stated that  the "driving force" behind the transaction described in the agreement was the strengthening and preservation of the Catholic Healthcare ministry of the Sponsor parties and their respective System parties  together with their mutual desire to create a new  form of "equal co-sponsorship."  The affiliation was undertaken in order to: advance the Catholic mission of the Sponsor parties and the System parties; provide greater coordination of the provision of patient care services; increase efficiencies  and decrease costs to health care consumers; provide greater patient access to both primary  care and specialized serves and  technologies and medical advances; enhance access to capital markets at lower costs; promote the education  of physicians and other health care professionals; improve strategic planning  of health care services within the system parties enhanced service areas; make available  more sophisticated clinical and management services and expertise; permit greater and more effective public health education and community preventative health measures; advance science through research; and provide continued and appropriate health care services to the consuming public within  the System parties' service areas.

The Master Agreement showed that the parties intended to develop a System which would be a region-wide, integrated, healthcare and human services delivery system with a clear identity and capacity of competing successfully in managed care contracting with other healthcare providers in the present diverse and competitive markets.  The terms of the Affiliation and the structure of the System, would allow

---

[33] Intermediary's Exhibit I-5.  In addition, the Master Agreement incorporated the "Vision Statement."

[34] Id.

[35] Id.

the Sponsor parties to retain their separate historical identities, unique traditions and constituents, while combining healthcare ministries and preserving their local philanthropic support and protecting their donor –restricted endowments. Towards this end, the hospital system entity to result from the affiliation was to be co-sponsored equally by the three Sponsoring parties with the classes of membership constituted to permit the exercise of the non-delegable canonical reserve powers of each of the respective Sponsoring parties.

The Master Agreement provided that the initial Board of Directors to be elected by the four classes of members (three classes to be made up of respective sponsoring organizations) were to total 19 members. Of that number, 12 members were to be at-large directors, with four to be elected by each Sponsoring member. In addition, one member was to be the CEO of the "System" corporation; one member was to be the COO/president of the "System" corporation and five members were to be elected by the member body.[36]

On November 26, 1997, Articles of Consolidation were filed with the Illinois Secretary of State.[37] As a result, effective November 30, 1997, the Provider consolidated with corporations sponsored by the Franciscan Sisters and Servants.[38] By operation of Illinois law, each of the consolidating entities, including the Provider and their assets and liabilities were transferred to the newly created corporation Provena Hospitals. Provena Hospitals in order to own and/or operate all of its hospitals. Sisters of Mercy, the sponsoring organization of the Provider's parent Mercy Health, Franciscan Sisters and Servants created Provena Health through amendment to the Articles of Incorporation of Mercy Health Corporation.[39]

Provena Health became the sole corporate member of Provena Hospitals. Many of the initial Board Members of the three sponsoring organizations were appointed to the consolidated corporation or otherwise appointed proportionally by the sponsoring organizations.[40] Finally, testimony elicited at the hearing substantiated the proposition that Mercy Health Corporation, the Provider's parent corporation,

---

[36] Four members of the Board of Provena Health and Provena Hospitals were formerly from the Provider and the Provider parent. Members appointed to Provena Health by the sponsoring organization of the Provider's parent were not identified.

[37] Provider's Exhibit P-3.

[38] Provider's Post-Hearing Brief at 16. ServantCor, the parent of the two hospitals operated by Servants of the Holy Heart, also participated in the consolidation.

[39] Provider's Exhibit P-4. Intermediary's Position Paper at 7. Provider's Post-Hearing Brief at 16.

[40] Id.

continued to exist through the amendment of its Articles of Incorporation to become Provena Health.[41]

Applying the foregoing provisions to the facts of this case, the Administrator finds that the Provider is not entitled to a loss on the disposal of its assets. For a gain or loss to be realized on the disposal of assets, the Administrator finds that the consolidation in this case must have occurred between parties that are not related. Further, in determining whether the parties to a transaction are related, the test of common ownership and control are to be applied separately, based on the facts and circumstances in each case to the parties both before, and after, the transaction.[42]

Based on the facts in the record, the Board properly determined that the consolidation was a related party transaction and the revaluation of the Provider's assets was not permitted. The Board properly concluded that Mercy Health Corporation, the Provider's parent corporation, maintained extensive reserve powers over the Provider's assets both before the consolidation and, as Provena Health, after the consolidation. Even though the Provider consolidated with other health care facilities, the Provider was essentially controlled by, and able to negotiate prior to the transaction with the same entity that was its controlling parent after the consolidation. Thus, the Board properly concluded that the Provider's relationship with its parent Mercy remained unchanged.

The Administrator agrees with the Board's finding that the consolidation in this case was a related party transaction and, thus, revaluation of the assets is not permitted. However, the Board found that, in determining whether the transaction in this case occurred between related parties, it was not necessary to examine relationships established after the consolidating transaction. The Administrator finds that, for purposes of determining whether parties are related, an examination of relationships of the entities both before and after the transaction is appropriate. In applying the related organizations principle at 42 C.F.R. § 413.17, PM A-00-76, explained that:

> [I]t is appropriate to compare the governing board/management team composition before the transaction with the governing board/management team composition after the transaction, even though there was no contemporaneous co-existence of the those boards/teams.

Furthermore, when evaluating relatedness, PM A-00-76 states that the focus of the inquiry should be "whether significant ownership or control exists between a

---

[41] Tr. July 16, 2003, at 147, Line 13.
[42] 42 C.F.R. § 413.17(b);  PRM § 1004 et. seq.

corporation that transfers assets and the corporation that receives them."[43] Thus, when determining whether a merger or consolidation involving a non-profit provider is a "related party" transaction, the Administrator finds that the analysis is not limited to the relationship between the parties before the transaction, but also includes an analysis of the relationship following the transaction.

In this case, the Administrator finds that the Provider was related to the consolidated entity both prior to the consolidating transaction as well as after the consolidation through ownership and the continuity of control. With respect to this latter finding, the record shows that Provena Health (formerly Mercy, the parent of the Provider) held significant governance powers over its former assets. In addition, most of the initial Board members were to be appointed proportionally by each of the three sponsoring organizations, which included the sponsoring organization of the Provider's parent. The local governing bodies in place immediately prior to the transaction continued as the governing bodies following the transaction. The facilities continued to operate after the transaction the same as they did prior to the transaction, with the owners remaining as a component of the new system.

The sponsoring organization of the Provider's parent remained a sponsoring organization of Provena Health, the parent of the Provena Hospitals, the holder of the Provider's assets after the transaction. Generally, the governing officials of the consolidated hospital system were chosen from the former governing officials of the prior parents and hospital systems or otherwise proportionally represented the respective Sponsoring organizations. The Sponsoring organization of the Provider's parent retained a significant number of members of the board of Provena Health/Provena Hospitals which would enable it to protect and control its original assets and mission.[44] The Provider's sponsoring organization continued on as a sponsoring organization of the amended corporate system, retaining certain exclusive reserve powers pertaining to the Provider's assets. In sum, for all purposes, the Provider was recast as part of a larger health system with retained co-ownership and control by the amended parent corporation and the Provider's Sponsoring organization. The Administrator concludes that the subject transaction was between related parties through the continuation of control and ownership by the Provider's sponsoring organization of the assets at issue. Thus, the Intermediary

---

[43] PM A-00-76 lists considerations in evaluating control including: (1) the determination of common control is subjective, i.e. no rule of thumb; (2) each situation must be examined on its own facts and merits; (3) a finding of common control does not require 50 percent or more representation; and (4) control need not be actually exercised, the mere potential to control is sufficient.

[44] The Provider's President was also named as the President of Provena Hospitals.

properly denied the loss claimed by the Provider. Accordingly, the Board's decision is affirmed as clarified herein.

### B. Bona fide sale.

The Administrator finds that the disposal of asset rules of paragraph (f) are properly applied in the event of a consolidation. This means that in order for a loss to be recognized, a transaction resulting in the transfer of depreciable assets must meet one of the applicable criteria of paragraph (f). Applying the rules to the facts of this case, the Administrator finds that the Provider's transfer of the assets to Provena Hospitals did not constitute a bona fide sale. Section § 104.24 of the PRM states:

> A bona fide sale contemplates and arms length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is...negotiated by unrelated parties, each acting in its own set interest.

In this case, the record shows that the Provider is a related party in this consolidation both prior to the transaction and after the transaction as demonstrated by ownership and the continuity of control. Therefore, the transaction was not a bona fide sale, and the Intermediary's disallowance of the loss is upheld.

Furthermore, the Administrator finds that the consideration (assumption of liabilities) received for the depreciable assets supports a finding that the transaction did not constitute a bona fide sale. Regarding the consideration received for the transfer of the Provider's assets, the assets were transferred from the Provider to Provena for the assumption of liabilities totaling $43,687,406. The Provider's audited financial statements as of November 30, 1997, reported total assets of $103,962,012.[45] The record shows that the Provider's net book value of its depreciable assets was $41,604,322,[46] with current assets totaling $29,815,880,[47] assets limited as to use totaling $27,298,420,[48] and other assets totaling $5,243,390.[49]

The Administrator notes that, in evaluating whether a bona fide sale has occurred, PM-A-00-76 explains that a comparison of the sales price with the fair market value or "FMV" of the assets is a required aspect of the analysis. In this case, no appraisal was conducted to determine the FMV of the depreciable assets by the

---

[45] Intermediary's Exhibit I-8 at 2.
[46] Id.
[47] Id.
[48] Id.
[49] Id.

24

Provider prior to the consolidation. An appraisal was conducted March 3, 1998, valuing the Provider's fixed depreciable assets at $42,220,000. The Administrator finds that the failure to conduct an appraisal before the consolidation transaction is an indication that factors other than receiving the best price for its assets were motivations in the transaction. Furthermore, the appraisal on its face shows that, similar to the net book value, the value of the depreciable, current assets and other assets were at least twice the value of the liabilities assumed in the transaction. Accordingly, the Administrator finds that there was no reasonable consideration transferred for the depreciable assets. As the transaction did not involve an arm's length transaction, the transaction was not a bona fide sale as required under the regulations and PRM for the recognition of a loss on the disposal of assets.

As a loss cannot be allowed in this case, the Administrator does not reach the issue of how to calculate the loss. However, the issue of calculating a loss does point out certain anomalous results of finding that a loss is to be calculated in a case when there has been no bona fide sale; especially where the value of the current assets/non-current cash and cash equivalents transferred is greater than the debt assumed. [50] The Administrator concludes that this further supports a finding that no loss is to be calculated under the facts of this case.

---

[50] As the value of the current, limited use and other assets exceeded the value of the assumption of liabilities, the depreciable assets were, for all practical matters, transferred for no consideration. A donation is a type of transaction where no gain or loss will be recognized.

25

## **DECISION**

The decision of the Board is affirmed, as herein clarified, in accordance with the foregoing opinion.


THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE
SECRETARY OF HEALTH AND HUMAN SERVICES

Date: 4|15|08

Herb B. Kuhn
Deputy Administrator
Centers for Medicare & Medicaid Services

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Provena Hospitals, as Successor in Interest to Mercy Center for Health Care Services

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     Will County, IL
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Harold G. Belkowitz
Ober, Kaler, Grimes & Shriver
1401 H Street, NW
Suite 500
Washington, DC 20005

## DEFENDANTS

Michael O. Leavitt, as Secretary of Health and Human Services

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A.** *Antitrust*

☐ 410 Antitrust

○ **B.** *Personal Injury/Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ **C.** *Administrative Agency Review*

☒ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.** *General Civil (Other)*          OR          ○ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Judicial review of adverse agency decision on Medicare payment under 42 USC § 1395oo(f)(1)

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ 4,665,124 + interest   Check YES only if demanded in complaint<br>JURY DEMAND:    YES ☐   NO ☒ |
|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE   June 18, 2008    SIGNATURE OF ATTORNEY OF RECORD   *Harold A. Belsey*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.