IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PROVENA HOSPITALS                  *
                                   *
v.                                 *
                                   *   Civil Action No. WMN-08-1054
KATHLEEN SEBELIUS, as              *
SECRETARY OF HEALTH AND            *
HUMAN SERVICE                      *
                                   *
    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

### MEMORANDUM

This action arises out of the November 30, 1997,
consolidation of three Illinois hospital systems.  Plaintiff
Provena Hospitals (Provena), the entity into which the three
systems consolidated, brings this action as the successor-in-
interest to Mercy Center for Health Care Services (Mercy
Center), one of the consolidating entities.  Provena challenges
the decision of the Secretary of Health and Human Services (the
Secretary) denying Mercy Center's reimbursement claims for
approximately $4.5 million in depreciation-related losses that
Provena asserts resulted from the consolidation.  The Secretary
denied Provena's claim for reimbursement on two grounds: (1)
that the consolidation was not between "unrelated parties" as
required under 42 C.F.R. § 413.134(k); and (2) that no "bona
fide sale" occurred as required under 42 C.F.R. § 413.134(f).

Provena argues that the "related party" and "bona fide
sale" policies used to deny Mercy Center's claim were adopted

only after the 1997 consolidation and that it was impermissible for the Secretary to apply them retroactively.  In the alternative, Provena argues that, even if those policies were in place when Provena was formed, the consolidation satisfied the requisite conditions.  The parties have filed cross motions for summary judgment, Paper Nos. 15 (Provena's) and 16 (the Secretary's), and the motions are fully briefed and supplemented.  Upon review of the pleadings and the applicable case law, the Court finds that the Secretary properly interpreted and applied the policy disqualifying from depreciation reimbursement consolidations that were not bona fide sales.[1]  Accordingly, the decision of the Secretary will be affirmed.[2]

## I. GENERAL STATUTORY AND REGULATORY FRAMEWORK

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq. (the Medicare Act) establishes a federally funded health insurance program for the aged and disabled.  The Centers for

---

[1] Because the Court's finding that the consolidation did not satisfy the "bona fide sale" requirement is dispositive, it need not reach the "related party" issue.

[2] Although Provena has requested oral argument, the decision as to whether to hold oral argument on a motion is left to the Court's discretion and in this instance, the Court finds that oral argument is not necessary given the complete and comprehensive written submissions.  See Local Civil Rule 7(f).

Medicare and Medicaid Services (CMS)[3] administers the Medicare program on behalf of the Secretary, but the Secretary also contracts with private fiscal intermediaries to make the initial determination as to how much a Medicare provider should be reimbursed for services.  See id. § 1395h.  If the provider disagrees with the intermediary's reimbursement determination, it can appeal that decision to the Provider Reimbursement Review Board (PRRB).  Id. § 1395oo(a).  After sixty days, the decision of the PRRB becomes the final decision of the Secretary unless the Secretary, through the CMS Administrator, elects to review it within that time period.  Id. § 1395oo(f)(1).  A Medicare provider can seek judicial review of a final decision of the PRRB or the CMS Administrator in a federal district court.  Id.

Under the Medicare Act, providers of Medicare services are entitled to be reimbursed for the "reasonable cost of [Medicare] services."  Id. § 1395f(b)(1).  The statute defines the "reasonable cost" of a service to be "the cost actually incurred, excluding therefore any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."  42 U.S.C. § 1395x(v)(1)(A) (emphasis added).  Furthermore, the reasonable cost is to be "determined in accordance with regulations establishing the method or methods

---

[3] Until 2001, CMS was known as the Health Care Financing Administration (HCFA).  See 66 Fed. Reg. 35437.

to be used," as promulgated by the Secretary.  Id.  In addition
to promulgating regulations, the Secretary also issues manuals,
such as the Provider Reimbursement Manual (PRM) and the Medicare
Intermediary Manual (MIM), to assist Medicare providers and
fiscal intermediaries in administering the reimbursement system.

Of particular relevance here, the regulations in effect at
the time of the 1997 consolidation stated that a provider could
claim reimbursement for "[a]n appropriate allowance for
depreciation on buildings and equipment used in the provision of
patient care."  42 C.F.R. § 413.134(a).  This allowance for
depreciation was calculated by prorating "the cost incurred by
the present owner in acquiring the asset" (its "historical
cost") over the asset's "estimated useful life," and then
estimating the percentage of the depreciation attributable to
providing services to Medicare patients.  Id. § 413.134(a)(3)
and (b)(1).  Providers were then reimbursed annually based upon
this depreciation calculation.

In recognition of the fact that these annual payments might
overstate or understate the true depreciation of the asset,
Medicare regulations provided, under certain circumstances, for
an adjustment to reconcile the previous annual depreciation
payments with the asset's actual value upon the disposal of the
depreciable asset.  The principal Medicare regulation that
addressed the depreciation of assets, 42 C.F.R. § 413.134,

4

stated that the treatment of the gains or losses from a disposal of those assets "depends on the manner of disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section." Id. § 413.134(f)(1).  Subsection (f)(2), entitled "Bona fide sale or scrapping," provided that gains and losses realized from the bona fide sale of depreciable assets could be considered in calculating allowable costs.[4]

When allowable, this adjustment under paragraph (f) was based upon the difference between the "net book value" (i.e., its initial depreciable basis minus subsequently recognized annual depreciation) and the consideration received for the asset at its disposal.  If the consideration received was greater than the asset's net book value, then the provider realized a gain and was required to remit that difference to Medicare on the assumption that the annual allowances overstated the actual depreciation.  If the consideration received was less than the asset's net book value, then the provider was deemed to have incurred a loss and received an additional depreciation reimbursement as a result of the disposition of the asset.  If the Medicare provider sells multiple assets for a "lump sum sales price," the provider must allocate the price received among the assets sold, "in accordance with the fair market value

---

[4]  Subsections (f)(3) through (f)(6) address methods of disposition of assets not relevant to the instant action.

of each asset." Id. § 413.134(f)(2)(iv). It must be remembered that the purpose of this adjustment upon disposal of an asset was to assure that "Medicare pays the actual cost incurred in using the asset for patient care." Via Christi Reg'l Med. Ctr. v. Leavitt, 509 F.3d 1259, 1262 (10th Cir. 2007).

Paragraph (k)[5] of § 413.134, which is at the center of this controversy, addressed three particular types of transactions: (1) the acquisition of a provider's capital stock; (2) a statutory merger; and (3) a consolidation. Although paragraph (k) was denominated as a provision related to "[t]ransactions involving a provider's capital stock," the Secretary has always interpreted it as applying in the non-profit sector as well, Via Christi, 509 F.3d at 1263 n.4 and 1272 n.12, and neither party disputes that the Secretary was correct in so doing. Under this paragraph, a consolidation was defined as a "combination of two or more corporations resulting in the creation of a new corporate entity." Id. § 413.134(k)(3). There is no dispute in this litigation that the formation of Provena was a consolidation within the meaning of this provision.

The portion of paragraph (k) addressing consolidations where at least one of the original entities was a Medicare provider, § 413.134(k)(3), draws a distinction between the

_____

[5]   This paragraph had been designated as 42 C.F.R. 413.134(*l*) prior to 2002. In this opinion, the Court will refer to it by its new designation.

treatment of consolidations involving "related" parties and those involving parties that are "unrelated."  If the parties to the consolidation were unrelated, the regulation permitted the assets of the provider corporation(s) to be revalued.  Id. § 413.134(k)(3)(i).  If the consolidation was between two or more related corporations, no revaluation of provider assets was permitted.  Id. § 413.134(k)(3)(ii).[6]

The portion of paragraph (k) related to statutory mergers contains a similar distinction between related and non-related entities.  § 413.134(k)(2).  As in the consolidation provision, no revaluation of assets was permitted if the merging entities were related.  Unlike the provision addressing consolidations, however, the statutory merger provision goes on to state that "[i]f the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses."  § 413.134(k)(2)(i).  As discussed above, paragraph (f) provides that a depreciation adjustment is only allowed if a sale was a "bona fide sale."  Although the consolidation provision, § 413.134(k)(3), does not contain a parallel reference to

---

[6]  Section 413.17 provides the definition of "related:" "Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies."

paragraph (f), the Secretary has interpreted it as containing a similar provision.  See infra.  The propriety of that interpretation is one of the central issues in this litigation.

One additional provision in the regulations is potentially relevant here.  Under the "general rules" section of 42 C.F.R. § 413.134, the term "fair market value" is defined in terms of a "bona fide sale:"

> Fair market value is the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition. Usually the fair market price is the price that bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition.

42 C.F.R. § 413.134(b)(2).  Here, the Secretary relies on this provision to incorporate a "fair market value" or "reasonable consideration" element into the requirement of a bona fide sale. This interpretation of the regulations is also a major issue in this litigation.

To understand the arguments put forth by Provena, some discussion of the historical development of Medicare policy related to depreciation and adjustments allowable on the disposal of depreciable assets is helpful.  Medicare regulations issued in November 1966 first designated depreciation as an "allowable cost," and required that gains and losses from disposal of assets be included in the allowable cost determination.  31 Fed. Reg. 14,808, 14,810-11 (Nov. 22, 1966).

The regulations, however, did not specify the procedures for calculating the gain or loss on disposal.

On January 19, 1979, the regulations were amended to address certain types of disposal of assets, including by "bona fide sale."  44 Fed. Reg. 3980, 3982-83 (Jan. 19, 1979).  This amendment added what is now § 413.134(f), discussed above.  Included in this amendment was the provision that, in the case of "lump sum sales," the sales price would be allocated to each asset according to its fair market value.  44 Fed. Reg. 3980, 3983.  In issuing these amended regulations, the agency stated that they "are intended to assure that the depreciation allowed under Medicare accurately reflects providers' costs of using assets for patient care."  44 Fed. Reg. 3980.

On February 5, 1979, the regulations were amended again to add what is now paragraph (k) of § 413.134, including the consolidation provision discussed above.  44 Fed. Reg. 6912, 6915 (Feb. 5, 1979).  When these amendments to the regulations were first proposed in 1977, the Secretary clarified that they were simply to describe the intention of existing programs regulations and principles when applied to "complex financial transactions."  42 Fed. Reg. 17485 (Apr. 1, 1977).  "The proposed amendments are a specific interpretation of existing program policy based on previously promulgated regulations."  Id.

The next development related to the recognition of gains or losses upon the disposal of a depreciable asset came not from the Secretary, but from Congress.  On July 18, 1984, Congress enacted Section 2314(a)(ii) of the Deficit Reduction Act of 1984 ("DEFRA") (Pub. L. No. 98-369), which required Medicare regulations to "provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984."  Although the language in DEFRA referred to "recapture of depreciation," courts, as well as the Secretary, have recognized that this provision applied both to transactions that result in a gain and to transactions that result in a loss.  See Lake Med. Center v. Thompson, 243 F.3d 568 (D.C. Cir. 2001); 57 Fed. Reg. 43,906, 43,907 (Sept. 23, 1992).

In 1987, the Secretary issued two pronouncements relevant to the consolidation provision in § 413.134.  In April 1987, the Secretary included an explanation in the MIM that "Medicare program policy permits a revaluation of assets affected by corporate consolidations between unrelated parties."  AR at 4197-98, MIM, 04-87, § 4502.7.  On May 11, 1987, William Goeller, Director of HCFA's Division of Payment and Reporting Policy of the Office of Reimbursement Policy, Bureau of Eligibility, Reimbursement and Coverage, responded to an inquiry concerning "the revaluation of assets and adjustments for gains and losses when two nonprofit hospitals merge or consolidate."

Administrative Record (AR) 4413-14.  Goeller explained that,

notwithstanding 413.134(k)'s reference to capital stock, that

provision also governs mergers and consolidations of nonstock,

nonprofit providers.  He continued:

> If the transaction you have described meets the
> definition of either a statutory merger or
> consolidation as set forth in the regulations section
> ..., then a revaluation of assets and/or an adjustment
> to recognize realized gains and losses may occur.
>
> To determine whether a revaluation of assets or a
> gain/loss adjustment will occur, we must turn to the
> question of whether the assets will be donated or
> whether any consideration will be exchanged for the
> assets. . . .
>
> [I]f the assets will be exchanged for consideration, a
> donation would not occur and the consideration given
> would be the acquisition cost of the assets to the new
> owner.  In a situation where the surviving/new
> corporation assumes liability for outstanding debt of
> the merged/consolidated corporations, the assumed debt
> would be viewed as consideration given.  Thus, in a
> merger or consolidation of nonstock, nonprofit
> corporations in which the surviving or new corporation
> assumes debt of the merged or consolidated
> corporations, . . . an adjustment to recognize any
> gain or loss to the merged/consolidated corporations
> would be required in accordance with regulations
> section 42 CFR 413.134(f).  For purposes of
> calculating gain or loss, the amount of the assumed
> debt would be used as the amount received for the
> assets . . . .

Id. (emphasis added).

On August 24, 1994, Charles Booth, the Director of the

Office of Payment Policy, Bureau of Policy Development, sent a

letter to counsel for a provider hospital responding to an

inquiry about a potential consolidation under which Hospital C

would acquire the assets of Hospitals A and B in exchange for the assumption of all liabilities of each organization.  AR 4416-17.  Booth replied that "based on our understanding of the transaction, [] it appears to be a consolidation as defined in § 413.134(k)(3)(i) requiring a determination of gain or loss under § 413.134(f)."  Id. at 4416 (emphasis added).  He went on to discuss the methodology to be used to apportion the sales price.

There is evidence in the record that, beginning in the 1990s, the dynamics of the health care industry changed such that change of ownership (CHOW) transactions began to generate significant losses where once they had generated gains.  See AR 4237, 4249-51, June 1997 Report of Office of Inspector General, "Medical Losses on Hospital Sales" (1997 OIG Report).  To address this issue, a "CHOW Workgroup" was convened for the purpose of "[reviewing] existing regulations and program manual provisions relating to provider changes in ownership for the purposes of making recommendations to HCFA [] to modify, update and expand program instructions considered necessary in order to provide current and complete guidance to fiscal intermediaries and providers, regarding proper treatment of change of ownership transactions to determine appropriate Medicare reimbursement."  AR at 4280 (Sept. 30, 1996, letter forwarding CHOW Workgroup recommendations).  The CHOW Workgroup's recommendations were passed on to the Office of the Inspector General (OIG) for

12

Health and Human Services which issued its own report and recommendations.  June 1997 OIG Report.

One of the recommendations coming out of the CHOW Workgroup and the OIG Report was for Congress to eliminate the restrictions it had put in place in 1984 with the passage of DEFRA and to allow the Secretary to change the Medicare reimbursement provisions related to the disposal of depreciable assets.  Congress acted on that recommendation in the Balanced Budget Act of 1997.  Pub. L. No. 105-33, § 4404(a), 111 Stat 251, 400 (1997).  In response, the Secretary promulgated what is now 42 C.F.R. § 413.134(f)(1), which prohibits the recognition of gains or losses for sales or scrappings that take place on or after December 1, 1997.  The consolidation at issue here, however, was consummated prior to that effect date, albeit by one day.

One of the other outcomes of the CHOW Workgroup was the issuance of an amendment to the PRM through a Transmittal of Changes dated May 2000 providing a definition of the "bona fide sale" requirement.  AR 4714-16, Transmittal 415.  Added to the PRM was § 104.24 which read, "A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration.  An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self

interest." AR at 4716. This additional language was identified as being "added to clarify existing instructions," and thus, no effective date was deemed necessary. AR at 4714.

In a similar vein, HCFA issued a Program Memorandum on October 19, 2000, (the 2000 PM) which stated it was being issued "to clarify application of the regulations at 42 CFR 413.134[(k)] to mergers and consolidations involving non-profit providers." AR at 5421, PM A-00-76. The 2000 PM explained that non-profit organizations "differ in significant ways from for-profit organizations," in that they exist for reasons other than to provide goods and services for a profit, inter alia, and, as a result, these organizations may engage in mergers and consolidations for reasons that may differ from those of for-profit organizations. AR at 5422. Because the regulations at 42 C.F.R 413.134(k) were written to address for-profit mergers and consolidations, "certain special considerations" must be regarded in applying that regulation section to non-profits. Id.

One of the differences identified between non-profits and for-profits is that, with non-profits, there is more often a continuation, in whole or part, of the composition of the management of the consolidating entities and that of the resulting consolidated entity. Where there is that continuation of management, the 2000 PM observed, no real change in control

14

of the assets has occurred.  For that reason, the 2000 PM stated that, where the board of the resulting entity includes a significant number of directors from the consolidating entities, the consolidation "can be deemed to be between related parties" and no gain or loss will be recognized, regardless of the fact that the consolidating entities were themselves unrelated before the transaction.

The 2000 PM also addressed the "bona fide sale" requirement of the regulations, making the unremarkable observation that, because many non-profit mergers and consolidations "have only the interest of the community-at-large" as opposed to interests related to ownership equity, these transactions "do not always involve engaging in a bona fide sale or seeking fair market value for the assets given."  AR at 5424.  The 2000 PM stated further,

> [N]o gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a bona fide sale as required by regulation 413.134(f). . . .  The regulations at 42 CFR 413.134[(k))]) do not permit recognition of a gain or loss resulting from the mere combining of multiple entities' assets and liabilities without regard to whether a bona fide sale occurred. . . .

> [F]or Medicare payment purposes, a recognizable gain or loss resulting from a sale of depreciable assets arises after an arm's-length business transaction between a willing and well-informed buyer and seller. An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest in which objective value is defined after selfish bargaining. . . .

> As with for-profit entities, in evaluating whether a
> bona fide sale has occurred in the context of a merger
> or consolidation between or among non-profit entities,
> a comparison of the sales price with the fair market
> value of the assets acquired is a required aspect of
> such analysis.  As set forth in PRM 104.24, reasonable
> consideration is a required element of a bona fide
> sale.  Thus, a large disparity between the sales price
> (consideration) and the fair market value of the
> assets sold indicates the lack of a bona fide sale.

AR at 5424.

The 2000 PM concluded with the declaration that, because "[t]his PM does not include any new policies," it should be applied to all cost reports for which a final notice of program reimbursement has not been issued.  Id. at 5425.

With that regulatory background and history in mind, the Court now turns to the particular transaction at issue in this litigation.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Until November 1997, Mercy Center was a not-for-profit corporation that operated a hospital in Aurora, Illinois.  Mercy Center's sole corporate member was Mercy Health Corporation (MHC).  MHC was sponsored by the Sisters of Mercy of the Americas, a Catholic religious order.  In early 1997, the Sisters of Mercy and two other Catholic orders that also operated acute care hospitals, Franciscan Sisters of the Sacred Heart and Servants of the Holy Heart of Mary, determined that it would be advantageous in terms of economies of scale, greater

coordination of services, and other considerations for the three orders to consolidate their acute care hospital facilities.  On July 3, 1997, the three orders entered into a Master Affiliation Agreement providing for the creation of a single Catholic-identified integrated healthcare and human services delivery system.

The consolidation occurred on November 30, 1997.  On that date, the three corporations sponsored by the three religious orders merged to form a new entity, Provena, and surrendered all of their assets to that new entity.  On that same date, Provena Health was created through amendment to the Articles of Incorporation of Mercy Center and Provena Health became the sole corporate member of Provena.  Under Provena's by-laws, the Mercy Center board continued in existence as the local governing body for the hospital that had been operated by Mercy Center. Furthermore, the president of Mercy Center became the chief executive of Provena Hospitals.

As for the financial aspects of the consolidation, there are some minor disagreements in the pleadings.  The Secretary asserts that Mercy Center received approximately $45.6 million for its assets in the form an assumption of all of Mercy Center's liabilities by Provena.  Secretary's Opp'n at 11 (citing AR at 501, Mercy Center's June 30, 1997, Balance Sheet). In exchange, Provena received assets valued at $102.9 million,

including $61.6 million in current assets and limited-use
assets.  Id.  From these figures, the Secretary opines that
Mercy Center sold its depreciable assets for nothing, and its
monetary assets at a steep discount.  Id. at 22.

Relying on Mercy Center's Balance Sheet from November 1997,
Provena avers that Mercy Center received approximately $43.7
million for its assets in the form of assumed liabilities.
Provena's Mot. at 33 (citing AR at 4781).  Provena further
asserts that, of that compensation, more than $15 million was
assigned to its fixed assets and more than $11 million to its
depreciated assets (fixed assets excluding land).  Id.  Using
this assignment of the compensation received and a net book
value of Mercy Center's depreciable assets (excluding land) of
about $36.5 million, Provena calculated a loss of over $25
million on depreciable assets from the consolidation, of which
it designated over $4.5 million as a loss attributable to
Medicare.  AR at 4781.

Provena, acting as Mercy Center's successor-in-interest,
submitted a cost report to its fiscal intermediary with a claim
for approximately $4.5 million for loss on disposal of
depreciated assets.  The intermediary denied the claim and
Provena appealed to the PRRB.  The PRRB affirmed the denial of
the claim on the ground that the consolidation was a "related
party" transaction for which the recognition of a gain or loss

18

is not permitted. AR at 41, PRRB Decision dated Feb. 15, 2008 (citing 42 C.F.R. § 413.134[(k)](3)(ii)). The CMS Administrator reviewed the decision of the PRRB and also affirmed the denial of the claim. AR at 2-26, Administrator's Decision dated April 15, 2008. The Administrator disallowed the claim on the ground that the consolidation was a related party transaction, AR at 18-24, but also on the ground that Mercy Center's transfer of assets to Provena did not satisfy the "bona fide sale" requirement which he concluded it must satisfy in order for Mercy Center to realize a loss on the transactions. Id. at 24-25. In addition to the absence of an arm's-length negotiation between unrelated parties, the Administrator found that there was no "reasonable consideration" transferred for the depreciable assets. Id. at 25.

Provena has sought judicial review of the Administrator's decision in this Court. The parties have submitted the Administrative Record from below and now both parties have moved for judgment.

### III. STANDARD OF REVIEW

This Court's review of the Secretary's decision is governed by the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq. (APA). Under the APA, a court can set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In the context of a review of a Medicare reimbursement

determination, the Supreme Court has observed that the reviewing

court:

> must give substantial deference to an agency's
> interpretation of its own regulations.  Our task is
> not to decide which among several competing
> interpretations best serves the regulatory purpose.
> Rather, the agency's interpretation must be given
> controlling weight unless it is plainly erroneous or
> inconsistent with the regulation.  In other words, we
> must defer to the Secretary's interpretation unless an
> alternative reading is compelled by the regulation's
> plain language or by other indications of the
> Secretary's intent at the time of the regulation's
> promulgation.  This broad deference is all the more
> warranted when, as here, the regulation concerns "a
> complex and highly technical regulatory program," in
> which the identification and classification of
> relevant "criteria necessarily require significant
> expertise and entail the exercise of judgment grounded
> in policy concerns."

Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512

(1994)(internal quotations and citations omitted).

Provena would add that to the standard of review that,

"'where the challenged decision stems from an administrative

about-face,'" the review of the agency action must be "'more

demanding.'"  Provena's Mot. at 10 (quoting Greater Yellowstone

Coal. V. Kempthorne, 577 F. Supp. 2d 183, 189 (D.D.C. 2008)).

"[I]t is true that an agency's interpretation of a statute or

regulation that conflicts with a prior interpretation is

entitled to considerably less deference than a consistently held

agency view."  Thomas Jefferson Univ., 512 U.S. at 515 (internal

quotations omitted).  Of course, this maxim would be inapplicable if it is shown that the Secretary's interpretations of the relevant regulations have been consistent.  Id.

In reviewing the agency's application of its regulations to the facts of a particular case, the court must determine if the agency's decision is supported by "substantial evidence."  5 U.S.C. § 706(2)(E).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).

## IV. DISCUSSION

As to the bona fide sale requirement, Provena makes four primary arguments: (1) that the regulatory requirements for a bona fide sale do not apply to consolidations; (2) that, if the bona fide sale requirement does apply, the consolidation at issue satisfied the requirement in that it was a consolidation between unrelated entities which were at arm's length from one another; (3) that the bona fide sale requirement did not include the requirement that there be "reasonable consideration;" and (4) that, if a bona fide sale required reasonable consideration, the consolidation at issue satisfied that requirement as well. See Mot. at 24.  Perhaps the single focal point, however, of Provena's challenge is its contention that, in denying the claim, the Secretary has retroactively applied to this 1997

consolidation an interpretation of the regulations that was not announced until the issuance of the 2000 PM.

The Court would first observe that all of the arguments Provena now advances regarding the Secretary's alleged "about-face" have been flatly rejected by every court that has considered them.  See Via Christi, 509 F.3d at 1274 (holding that "in order for consolidating Medicare providers to obtain reimbursement for a depreciation adjustment, the consolidation must meet the "bona fide sale" requirements of 42 C.F.R. § 413.134(f)")[7]; Sewickley Valley Hosp. v. Sebelius, No. 08-3360, 2009 WL 2195793 (3rd. Cir. 2009) (same); Albert Einstein Med. Ctr., 566 F.3d 368 (3 Cir. 2009) (holding that the 2000 PRM amendment and the 2000 PM offered a "clarification of the Bona Fide Sale Provision that was not inconsistent with previous agency policy" and it was not an error to apply that provision to a claim arising from a 1997 statutory merger); Robert F. Kennedy Med. Ctr. v. Leavitt, 526 F.3d 557 (9th Cir. 2008) (following Via Christi and applying bona fide sale and "reasonable consideration" requirement to 1996 statutory

---

[7] While affirming the Secretary's denial of the provider's claim on the ground that the consolidation did not satisfy the bona fide sale requirement, the Tenth Circuit in Via Christi rejected the Secretary's interpretation of the "related party" requirement.  509 F.3d at 1272-74.

merger).[8]  Providers challenging the Secretary's interpretation
in many of these cases mount their challenges on much of the
same regulatory history as Provena relies on here.[9]  The Court
notes that the evidence Provena presents here in arguing that
the consolidation satisfied the bona fide sale and reasonable
consideration requirements is also similar to, and just as
unpersuasive as, the evidence presented in these other actions.

     In Via Christi, the Tenth Circuit reached the ultimate
conclusion that "the 'bona fide sale' requirement is a
reasonable construction of 42 C.F.R. § 413.134[(k)](3)(i),
supported by the text of the regulations."  509 F.3d at 1274.
The court began with the observation that, "[s]ection 413.134(f)
is the only section expressly permitting depreciation
adjustments and defining the exact circumstances under which a
provider can seek such an adjustment."  Id. (emphasis in
original).  Thus, if the Secretary is to construe §

---

[8] See also, Lehigh Valley Hosp.-Muhlenberg v. Leavitt, 253 Fed.
App'x 190, 194-95 (3rd Cir. 2007) (applying bona fide
sale/reasonable consideration requirement to 1997 statutory
merger); St. Luke's Hosp. v. Sebelius, No. 08-883 (D.D.C. Sept.
30, 2009); UPMC-Braddock Hosp. v. Leavitt, No. 07-1618, 2008 WL
4442056 (W.D. Pa. Sept. 29, 2008) (same); North Iowa Med. Ctr.
v. Dept. of Health & Human Servs., 196 F. Supp. 2d 784, 787
(N.D. Iowa 2002) (stating that "[u]nder 42 C.F.R. § 413.134(f),
a sale of depreciable assets is bona fide if (a) fair market
value is paid for the assets, and (b) the sale is negotiated (i)
at arms' length (ii) between unrelated parties")

[9] That is not surprising as the law firm representing Provena in
this action is the same firm representing the providers in
several of these other actions.

413.134(k)(3)(i) as permitting depreciation adjustments after
consolidations, it is reasonable for the Secretary to only allow
depreciation adjustments for transactions that comply with §
413.134(f).  Id. at 1274-75.  The court opines that it also
would have been reasonable for the Secretary to have interpreted
"the plain language of § 413.134[(k)] as precluding any
adjustment to depreciation payments."  Id. at 1274 n.13.

    Once the Secretary determined to allow a depreciation
adjustment under § 413.134(f) for a consolidation, the Via
Christi court reasoned, the only disposal of depreciable assets
identified in section (f) that could even potentially apply is
the "bona fide sale" provision.  Id. at 1275.  Again, the court
opined that the Secretary could have reasonably concluded, as
Provena argues here, that consolidations simply are not the same
as sales.  The result of that conclusion, however, would be that
Provena would automatically lose its claim as a consolidation
would satisfy none of the other provisions of § 413.134(f)
permitting a depreciation adjustment.  See id. at 1275 n.14.

    In the final step of its evaluation of the Secretary's
interpretation of the regulations, the Via Christi court
concluded that the Secretary's inclusion in the definition of
"bona fide sale" "(1) arm's length bargaining, [including] an
attempt to maximize any sale price, and (2) reasonable
consideration" was a reasonable interpretation and was entitled

to deference.  Id. at 1275.  In reaching this conclusion, the court relied on the relationship between "fair market value" and "bona fide" established elsewhere in § 413.134, specifically in the definition of "fair market value" as "the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition."  §413.134(b)(2).  This Court would add that, as the whole purpose of the depreciation adjustment regulations was to assure that the depreciation allowed "accurately reflects" the providers' true costs of using assets for patient care, 44 Fed. Reg. 3980, supra, only a methodology that includes a means of determining the fair market value of the assets at the time of the consolidation could serve that purpose.

The Via Christi court found no direct inconsistencies between this understanding of the regulations and the prior interpretive materials which are cited by Provena in this action.  Nor does this Court.  For example, while the 1987 Goeller letter cited by Provena and the provider in Via Christi stated that "a revaluation of assets and/or an adjustment to recognize realized gains and losses may occur" when nonprofit providers consolidate, it also specifically stated that any adjustment to recognize a gain or loss to the merged/consolidated corporations would be "in accordance with regulations section 42 CFR 413.134(f)."  AR 4413-14 (emphasis

added).  Similarly, the 1994 Booth letter discusses how gains or
losses would be computed if they were to be recognized.  The
letter expressly stated, however, that the "determination of
gain or loss" would be made "under § 413.134(f)."  AR at 4416.
Contrary to Provena's contentions, there simply has not been a
definitive interpretive statement declaring that the bona fide
sale and reasonable consideration requirement would not apply to
the recognition of gains or losses on depreciable assets in a
consolidation.

Furthermore, the Secretary provides reference to a decision
issued long before the consolidation at issue here in which the
Secretary and the district court reviewing the agency's decision
took the position that the concept of bona fide sale included
the receipt of reasonable consideration.  Secretary's Mot. at 20
(citing Hospital Affiliates Int'l, Inc. v. Schweiker, 543 F.
Supp. 1380 (D. Tenn. 1982)).  In Hospital Affiliates, the PRRB
denied a loss on depreciable assets claim arising from the sale
of a hospital to a non-profit.  The PRRB denied the claim, and
the district court affirmed that decision, on the ground that
the transaction was between related parties.  The court went on,
however, to note that "the present case could not be found to
involve a bona fide transaction on this record.  There is no
evidence in the record that the purchase price bore any relation
to the actual value of the property.  Without such evidence, no

26

determination of the transaction's being bona fide is appropriate."  543 F. Supp. 1380.

In contrast to the reasonableness of the Secretary's interpretation, Provena's would allow a provider to recognize a loss on a consolidation whenever the liabilities assumed are less than the net book value, regardless of whether the provider actually experienced a true loss.  In a somewhat half-hearted attempt to rationalize its position, Provena declares that "there is frequently a direct relationship between hospital assets and liabilities," because when hospitals borrow for capital projects, those projects add to the value of the hospital's assets.  Provena's Reply at 8 n.2 (emphasis added). Of interest, the Court notes that the firm representing Provena in this action acknowledged in a similar action recently decided by Judge Robertson, that it would be "mere happenstance" if the fair market value of the merged entity's assets were to be equal to the assumed liabilities.  St. Lukes, Slip Op. at 10 (quoting Pl.'s Mot. at 19).  This Court is inclined to agree with the "mere happenstance" assessment and Provena provides no evidence to support its current conjecture.  Regardless, whether it is by "happenstance" or "frequently," it would be an odd result that the regulation would automatically base a loss calculation on a "price" with no more certain relationship to actual value.  It would be particularly odd given that the whole purpose of the

depreciation adjustment provision was to provide a more accurate
assessment of the costs "actually incurred" in providing
Medicare services than that provided by the net book value.

For all these reasons, the Court finds that the Secretary's
interpretation of the regulations is entitled to deference.

The Court also finds that there was substantial evidence
supporting the Administrator's determination under that
interpretation that the consolidation at issue was not a bona
fide sale.  There is no evidence that the 1997 consolidation was
an "arm's length" transaction.  As clarified in the 2000 PM, an
arm's length transaction is "a transaction negotiated by
unrelated parties, each acting in its own self interest in which
objective value is defined after selfish bargaining."  AR at
5424.  While Provena argues at length that the three Catholic
health care systems were unrelated prior to the consolidation,
there is no evidence that they bargained or negotiated over the
sales price for Mercy Center's assets.  This is not at all
surprising given the expressed purpose of the consolidation, as
set forth in the Master Affiliation Agreement signed on July 3,
1997.

In that Agreement, Mercy Center and the other two
consolidating hospital systems stated that their goal was "to
effect a commonality of ownership and control between [the
consolidating systems] which will permit an integrated

28

Affiliation of their respective organization . . . into a single
Catholic-identified integrated healthcare and human services
delivery system." AR at 5018. The Agreement described the
"driving force behind the transactions" as "the strengthening
and preservation of the Catholic healthcare ministry of the
Sponsor Parties and their respective System Parties, together
with their mutual desire to create a new form of equal co-
sponsorship of the system." Id. at 5018-19. The Agreement also
noted that the terms of the transactions and the resulting
system "will allow the Sponsor Parties to retain their separate
historical identities, unique traditions and constituencies
while combining their healthcare ministries and preserving their
local philanthropic support and protecting their donor-
restricted endowments." Id. at 5020.

Given the nature of the institutions involved, these are
certainly appropriate reasons for entering into the transaction
and are certainly worthy goals. They plainly are not, however,
indicia of an arm's length transaction. These expressed reasons
for entering into the consolidation also explain why Mercy
Center made no efforts to find another purchaser, nor did it
even obtain an appraisal of its assets prior to the
consolidation to determine what their value might be.

The Court also finds that there was substantial evidence in
support of the determination that Mercy Center did not receive

reasonable consideration for its assets.  An appraisal of Mercy
Center's fixed and intangible assets that was undertaken after
the consolidation, in March of 1998, determined that the fair
market value of Mercy Center's fixed and intangible assets at
the time of the consolidation was $38,470,000.[10]  In addition, at
the time of the consolidation, Mercy Center had monetary assets
valued at approximately $61.6 million, including almost $33.3
million in current assets.  Thus, Provena received assets valued
at over $100 million in exchange for assuming just $45.6 million
of Mercy Center's liabilities.  Courts have consistently found
that discrepancies of this scale demonstrate the absence of a
bona fide sale.  See, e.g., Lehigh Valley Hosp.-Muhlenberg, 253
Fed. App'x at 197 (holding that assumption of liabilities of
$43.7 million for hospital's assets valued at over $100 million
did not constitute a bona fide sale); Robert F. Kennedy Hosp.,
526 F.3d at 563 (holding transaction lacked "reasonable
consideration" where approximately $50 million in assets were
transferred for the assumption of $30.5 in liabilities).

---

[10] The Secretary represents the value of these assets as $42.2
million.  Secretary's Mot. at 32 (citing AR at 4783-86).
Provena contests this figure, arguing that the $42.2 million
figure included the value of two medical office buildings that
were owned, not by Mercy Center, but by one of its sister
corporations.  Provena's Reply at 12 n.5 (citing AR at 438, Tr.
of PRRB Hearing and AR at 4785, March 3, 1998 Appraisal Report).

To avoid that finding here, Provena argues that it also
assumed contingent liabilities of Mercy Center that should have
been factored into the price paid for Mercy Center's assets.
Provena's Mot. at 34.  The Secretary notes that Provena made no
effort to prove the value of these contingent liabilities during
the administrative proceedings, and there is certainly no record
that these liabilities were considered in structuring the
transaction.  Courts have consistently rejected similar
arguments based upon the existence of "contingent liabilities."
See, e.g., Via Christi, 509 F.3d at 1277 n.16 (noting that where
parties' due diligence before consolidation considered these
risks acceptably low, provider could not, in arguing it received
reasonable consideration, "make a mountain out of what it
previously determined to be a molehill"); Albert Einstein Med.
Ctr., 566 F.3d at 379 n.11 (rejecting argument that assumption
of unknown liabilities drove the sale price lower, opining that
it is "hard to imagine how an adjustment in price for this risk
could account for" a $32 million discrepancy).

Provena raises a number of additional challenges to the
Secretary's determination that can be addressed collectively.
Provena argues: (1) that the Administrator's decision was
arbitrary and capricious because it relied on a change in policy
set forth in the 2000 PM without a rational explanation for that
change in policy, Provena's Mot. at 35-37; (2) that the May 2000

amendment of the PRM and 2000 PM effected "significant change in
Medicare program policy" and thus violated the restrictions put
in place under DEFRA, id. at 37-38; (3) that the Administrator's
determination represented an impermissible retroactive
imposition of a new interpretive rule on a regulated party, id.
at 38-39; (4) that the 2000 PM "added substantive context – new
requirements" to the consolidation regulations and
"represent[ed] a significant departure from long established and
consistent practice" and thus, was subject to the APA's notice
and comment requirements, with which the Secretary failed to
comply, id. at 39-41; (5) that the Secretary failed to timely
include the 2000 PM in the mandatory list of agency issuances
published in the Federal Register under 41 U.S.C. §
1395hh(c)(1), and thus, the policies set forth in the 2000 PM
could not be used to deny Provena's claim, id. at 41; and (6)
that the 2000 PM represented the announcement of a "major rule"
under the Congressional Review of Agency Rule Making Act ("CRA")
and, as such, had to be submitted to Congress before being put
into effect and, because it was not, it is unenforceable.  Id.
at 42-44.

Each of these arguments, however, is premised on Provena's
assertion that the Secretary had previously committed to a
position that reimbursements for "losses" could be realized on
consolidations without regard to whether any true loss occurred.

Because the Court rejects that premise, Provena's additional arguments fail.[11]

## V. CONCLUSION

For all these reasons, the Court finds that the Secretary's denial of Provena's claim should be upheld.  Accordingly, the Secretary's motion for summary judgment will be granted and Provena's motion for summary judgment denied.  A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge
for the District of Maryland
(sitting by designation)


DATED: October 13, 2009

---

[11]  Some of these arguments fail for additional reasons as well. For example, Provena's CRA claim also fails because the statute expressly states that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review."  5 U.S.C. § 805.  See Montanans for Multiple Use v. Barbouletos, 568 F.3d 225, 229 (D.C. Cir. 2009) (holding that this provision denies courts the power to void rules on the basis of agency noncompliance with the CRA).